No. 58,404

STATE OF KANSAS, *Appellee*, v. DONALD EUGENE ALEXANDER,
*Appellant.*

(729 P.2d 1126)

Opinion filed December 5, 1986.

*Michael E. Riling*, of Riling, Norwood, Burkhead & Fairchild, Chartered, of Lawrence, argued the cause, and *Wesley M. Norwood*, of the same firm, was with him on the brief for the appellant.

*Gerald E. Wells*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *James E. Flory*, district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is a direct appeal taken by the defendant, Donald Eugene Alexander, from his convictions by a Douglas County jury of first-degree murder (K.S.A. 21-3401), rape (K.S.A. 1985 Supp. 21-3502[b]), and aggravated burglary (K.S.A. 21-3716). Numerous trial errors are asserted on appeal.

On the morning of August 5, 1984, the dead body of Mrs. V., an 80-year-old woman, was found in her bedroom lying in a pool of blood. An autopsy revealed the victim had suffered severe blows to her head by an instrument and had been sexually assaulted by a rigid instrument inserted into her anus. The victim's death was estimated to have occurred sometime between 10:00 p.m. on August 4, 1984, and 9:00 a.m. on August 5, 1984.

After seventeen days, the investigation of Mrs. V.'s death had reached a stalemate and the police officers returned to the victim's neighborhood to re-interview persons living there. The

defendant lived next door to the victim with his parents. The defendant accompanied two detectives to the police station at approximately 10:00 a.m. At 6:50 p.m., that same day, the defendant confessed to killing Mrs. V. The facts surrounding his confession will be discussed later in this opinion.

The defendant was charged and convicted of first-degree murder, rape, and aggravated burglary. His defense was not guilty by reason of insanity.

The defendant first asserts the trial court erred by allowing a jailer to testify that he had observed the defendant in jail and had observed nothing unusual in his behavior. The defendant does not object to a lay person's testimony concerning the defendant's sanity, but does object to the jailer mentioning that the defendant was incarcerated.

The last witness the State called in its case in chief was Greydon Walker, a Douglas County jailer where the defendant was being held. He stated he had had the opportunity to observe the defendant as there were cameras which monitored the inmates inside their cells. The defendant objected to the reference to his incarceration and a hearing on the objection was held outside the jury's presence. The State stated the sole purpose of calling Mr. Walker was to present lay testimony regarding the defendant's demeanor. In a proffer to the court, Mr. Walker stated he had observed nothing unusual in the defendant's behavior since he had been in jail. Based upon that proffer, the trial court allowed Mr. Walker to testify. When the jury returned, Mr. Walker testified that from December 6, 1984, on, he had noticed nothing "unusual or irrational" in the defendant's behavior.

The defendant argues the testimony of Mr. Walker was "nothing more than a direct attempt by the State to underline the fact that the defendant was incarcerated before the trial and during the trial."

First, in an insanity case, lay testimony is permissible concerning the defendant's sanity at the time of committing the crime provided the trial judge finds the opinion is rationally based on the witness' perception and is helpful to a clearer understanding of his testimony. *State v. Randol,* 212 Kan. 461, 468, 513 P.2d 248 (1973), and cases therein cited. See *State v. Shultz,* 225 Kan. 135, 137, 587 P.2d 901 (1978). Here, the crime

was committed August 4, 1984, and Mr. Walker testified to the defendant's behavior after December 6, 1984, over four months later. His testimony did not concern the defendant's behavior during a time period that was sufficiently close to the time the crime was committed.

Second, the defendant cites *Estelle v. Williams*, 425 U.S. 501, 48 L. Ed. 2d 126, 96 S. Ct. 1691, , *reh. denied* 426 U.S. 954 (1976), to support his argument it was error to allow testimony that the defendant was in jail. The defendant in *Estelle* was also in custody before and during his trial. He had asked for, but was denied, civilian clothes to wear during the trial. The defendant did not object to this denial, however, until after his conviction, in a writ of habeas corpus. The Supreme Court ruled that consistent with the Fourteenth Amendment the State cannot compel an accused to stand trial by a jury wearing identifiable prison clothes; however, because the defendant did not make a timely objection, there was no compulsion and no error. 425 U.S. at 512-13.

Kansas has addressed the issue of a defendant wearing prison clothes during his jury trial and has ruled that a defendant's appearance in prison clothes does not in and of itself constitute reversible error, that prejudice to the defendant must be shown. *State v. Hall*, 220 Kan. 712, 715, 556 P.2d 413 (1976). See *State v. Morgan*, 231 Kan. 472, 479, 646 P.2d 1064 (1982), *State v. Gilder*, 223 Kan. 220, 225, 574 P.2d 196 (1977).

Other jurisdictions have held where the defendant is seen in shackles, handcuffs, or prison clothes by the jury, such error was harmless error in light of the evidence presented of defendant's guilt. *Mitchell v. Engle*, 634 F.2d 353 (6th Cir. 1980); *Boswell v. State of Ala.*, 537 F.2d 100 (5th Cir. 1976); *State v. Reid*, 114 Ariz. 16, 559 P.2d 136 (1976), *cert. denied* 431 U.S. 921 (1977); *People v. Jacla*, 77 Cal. App. 3d 878, 144 Cal. Rptr. 23 (1978); *Fernandez v. United States*, 375 A.2d 484 (D.C. 1977); and *State v. Leggett*, 363 So. 2d 434 (La. 1978).

This case, where the jury is told the defendant was observed in jail, and the above cases, where the defendant was seen by the jury in prison clothes or handcuffed, are analogous. In both, the jury discovered the defendant was incarcerated during trial. Such information is contrary to the presumption of innocence and it was erroneous for the trial court to allow the jailer's

testimony. However, was it harmless error? In applying the Kansas harmless error rule (K.S.A. 60-2105), a reviewing court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984); *State v. Johnson*, 231 Kan. 151, 159, 643 P.2d 146 (1982). Here, testimony that the defendant was in jail had little likelihood of affecting the outcome of the trial in light of the defendant's confession, which will be discussed later, and the testimony of the various experts regarding his mental capacity.

The defendant's second issue is that the trial court abused its discretion in allowing the State to recall Dr. Herbert Modlin as a rebuttal witness.

In its case in chief, the State introduced evidence that the defendant was sane at the time of the crime through the testimony of Dr. Modlin. During the presentation of the defendant's case, Dr. Elias Chediak testified the defendant did not know the difference between right and wrong at the time of the crime because the defendant suffered from a "brief reactive psychosis." Dr. Chediak explained a "brief reactive psychosis" appears when a person is exposed to a psychosocial stressor and experiences a severe distress. The resulting effect can be a state of confusion, suicidal or aggressive tendencies, hallucinations, or delusions. The "brief reactive psychosis" lasts from a few hours to two weeks, with the person eventually returning to his previous level of functioning. Dr. Chediak also explained that the term "psychosis" means the loss of contact with reality and that a person suffering from the above diagnosis can lose the ability to distinguish between right and wrong.

Dr. Chediak was the last witness the defendant called. On rebuttal the State recalled Dr. Modlin to testify. The State asked Dr. Modlin if he had an opinion whether the defendant suffered from any "brief reactive psychosis," and the defendant objected on the basis this was not proper rebuttal. The State responded that Dr. Chediak's testimony was the first time it had learned the defendant suffered from a "brief reactive psychosis," as that diagnosis was not included in Dr. Chediak's written psychological evaluation provided to the State. The trial court overruled the defendant's objection and allowed the rebuttal testimony of Dr.

Modlin. Dr. Modlin testified that, in his opinion, at the time the defendant entered and left the victim's house, the defendant did not suffer from a "brief reactive psychosis."

On many occasions this court has stated the law concerning rebuttal testimony:

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice." *State v. Weigel*, 228 Kan. 194, 200, 612 P.2d 636 (1980).

See *State v. Lovelace*, 227 Kan. 348, 353, 607 P.2d 49 (1980); *State v. Shultz*, 225 Kan. 135, 138, 587 P.2d 901 (1978); *State v. Phipps*, 224 Kan. 158, 161, 578 P.2d 709 (1978); *State v. Stuart and Jones*, 223 Kan. 600, 604, 575 P.2d 559 (1978).

Here the trial court did not abuse its discretion in allowing the rebuttal testimony. Dr. Chediak's psychological evaluation provided to the State made no mention of a "brief reactive psychosis"; rather, the evaluation concluded the defendant suffered from a "major depressive illness." We note that in its case in chief the State questioned Dr. Modlin whether, in his opinion, the defendant suffered from a "major depressive illness" and his answer was no. While Dr. Modlin testified he relied on the "Diagnostic and Statistical Manual of Disorders-III" (DSM-III), he did not state that manual was the basis for his opinion, as the defendant argues. Furthermore, the defendant misstates Dr. Modlin's case-in-chief testimony when the defendant argues Dr. Modlin testified the defendant suffered from no DSM-III disorders. While the "brief reactive psychosis" is one disorder listed in the DSM-III, Dr. Modlin was only questioned during the State's case in chief whether the defendant suffered from a "major depressive illness," and not whether he suffered from any of the many mental disorders contained in the DSM-III. Dr. Modlin did not touch upon the disorder of a "brief reactive psychosis" in the State's case in chief, and, therefore, he did not testify to the same thing twice. The rebuttal testimony was proper.

The third issue is whether the trial court erred in denying the defendant's motion for a change of venue. In support of his motion for a change of venue the defendant submitted twelve Lawrence Journal World newspaper articles, three University of Kansas newspaper articles, four television reports, one radio report, two Topeka Capital Journal newspaper articles, two Lawrence editorials concerning crime and police work, one religious pamphlet received by the defendant, and one hateful letter sent to the defendant's home address.

The issue of whether it was error to deny a motion for a change of venue was recently discussed in *State v. McKibben,* 239 Kan. 574, 579, 722 P.2d 518 (1986), as follows:

"K.S.A. 22-2616(1) allows a change of venue once 'the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county.' The granting of a change of venue lies within the sound discretion of the trial court. *State v. Sanders,* 223 Kan. 273, 280, 574 P.2d 559 (1977). The burden is on the defendant to establish prejudice as a demonstrable reality, and not as a matter of speculation. Specific facts and circumstances must be established to indicate it will be practically impossible for the defendant to obtain an impartial jury to try the case. *State v. Haislip,* 237 Kan. 461, 485-86, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985); *State v. Hill,* 223 Kan. 648, 650-51, 664 P.2d 840 (1983). Media publicity alone will not establish prejudice per se. *State v. May,* 227 Kan. 393, 395, 607 P.2d 72 (1980); *State v. Gander,* 220 Kan. 88, 92, 551 P.2d 797 (1976)."

We have reviewed the articles and find they are factual and objective. We note that after the defendant's pretrial motion for a change of venue had been denied, the matter of pretrial publicity was taken up during voir dire. The jury panel was asked a three-part question: whether they had heard or read anything about the case; and if so, whether that would lead them to be predisposed about the case; and if so, whether they could set aside their predispositions and be fair and impartial. Thirty-five panel members responded they had read or heard something about the case. Twenty-seven of those thirty-five stated they had formed no predispositions; five stated they had formed a predisposition but could set it aside and act fairly and impartially; three jurors stated they could not set aside their predispositions and those jurors, only three out of the thirty-five, were struck for cause.

In his brief the defendant cites the statement of panelist Baxter to show the degree of prejudice against the defendant in the community.

"PANELIST BAXTER: Yes, I have read about the case; and if by 'predisposition,' you mean forming an opinion, I would think at the present time I have an opinion which was based upon the—what I considered the facts available to me at the time. However, this would not prevent me from reviewing the whole thing if new facts were presented."

The defendant, however, fails to cite the complete questioning by defense counsel which includes responses by Mr. Baxter that he had an open mind and he could set aside any predisposition and reach a fair and impartial verdict. Defense counsel did not seek to have Mr. Baxter removed for cause.

Here, the defendant has failed to meet his burden of establishing prejudice by a demonstrable reality. The media reports are factual and objective in nature and were printed or released nearly four months prior to trial. Of the thirty-five jurors who had heard or read the media coverage, the three who stated they could not be fair and impartial were struck for cause. The trial court did not abuse its discretion in denying the defendant's motion for a change of venue.

The fourth and fifth issues raised concern events surrounding the questioning of the defendant, the collecting of samples of the defendant's pubic hair and body hair, and the giving of his confession.

First, the defendant argues the trial court erred in refusing to suppress the defendant's hair samples. The defendant argues that although the defendant consented to the gathering of such evidence at the time, his consent was not voluntary but was the product of subtle pressures of the police officers.

On August 22, 1984, over two weeks after the crime, two detectives were assigned to interview the defendant. They had not interviewed him before. When the officers arrived at the defendant's house at approximately 10:00 a.m., the defendant and his father were standing in the driveway. The defendant agreed to talk to the detectives at the police station and went with them in their car. The interview started at approximately 10:10 a.m. in an interview room. The defendant was not under arrest and was free to go. The police were looking for general information and asked what the defendant was doing on August 4, 1984. From 10:10 to 10:45 a.m., the defendant described his activities. He stated he had been in the victim's house a week and a half before the crime and had used the bathroom. At 10:45

a.m., the police asked to take the defendant's fingerprints, handprints, and samples of his pubic hair and body hair. The detectives testified the defendant was not a suspect at this time. They testified they had asked for the samples as part of the elimination process—a lot of physical evidence had been collected at the crime scene and the defendant had stated he had been in the victim's house. This same request had been made of other people interviewed. The defendant consented to their request and, at approximately 11:15 a.m., pulled and cut his own hairs. The defendant was not told he did not have to give the samples. At 11:37 a.m., after the samples were taken, the defendant was read his *Miranda* rights, and at 11:41 a.m., he signed a written waiver form waiving those rights.

The defendant's pretrial motion to suppress the hair samples was denied by the trial court based upon findings that the defendant went voluntarily with the detectives, he was not under arrest, he was free to leave, the purpose of the interview was to explore leads and gain information, and it was understandable why the samples were requested in a follow-up investigation.

The defendant argues the hair samples should have been suppressed. The defendant does not argue that he should have been read his *Miranda* rights before the samples were taken, but does argue the fact that the *Miranda* rights were not read until after the samples were taken goes to the question of whether the defendant's consent was voluntary.

The scope of review on this issue has been often stated. If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court. *State v. Nicholson*, 225 Kan. 418, 423, 590 P.2d 1069 (1979); *State v. Johnson*, 223 Kan. 185, 187, 573 P.2d 595 (1977); *State v. Youngblood*, 220 Kan. 782, Syl. ¶ 2, 556 P 2d 195 (1976).

In *State v. Buckner*, 223 Kan. 138, 574 P.2d 918 (1977), the defendant argued the taking of hair samples was illegal because the defendant did not voluntarily consent. This court stated that *assuming* the taking of the hair samples constituted a search not conducted incident to a lawful arrest, the State had the burden to prove by a preponderance of the evidence that the defendant voluntarily consented to the search. 223 Kan. at 143. This court went on to say:

"The existence and voluntariness of a consent to search and seizure is a question of fact to be decided in light of attendant circumstances by the trial court and will not be overturned on appeal unless clearly erroneous. (*State v. Jakeway*, 221 Kan. 142, 146, 558 P.2d 113, and authorities cited therein.)" 223 Kan. at 144.

Here, there is evidence to support the trial court's findings. The defendant freely accompanied the police officers to the police station, he cut and pulled his own hair samples, and even after he was read his *Miranda* rights he waived them and agreed to talk. At the time the samples were taken, the defendant was free to leave and was not under arrest.

Next, the defendant argues his confession was not voluntarily given but was the result of "sophisticated and subtle modes of persuasion" used by the police officers.

After the defendant was read his *Miranda* rights at 11:37 a.m., and had signed a written waiver at 11:41 a.m., the defendant described the kind of cigarettes he had purchased the night of August 4, 1984—Marlboro Reds in a soft package. A package of this brand had been discovered inside a door to the victim's garage. When asked what shoes he had been wearing that night the defendant replied the very shoes he had on. At approximately 12:09 p.m., the police asked if they could have the defendant's shoes to test them for blood and the defendant gave the officers his shoes. The defendant was asked if he had attacked the victim and he responded "No." Shortly after that statement, the defendant asked to go home and the interview concluded at 12:47 p.m. The defendant did not want to leave the police station without shoes, so he waited while the officers located another pair.

At approximately 1:13 p.m., the officers asked if they could search the defendant's bedroom and the defendant gave them permission. The officers and the defendant arrived at the defendant's house at 1:30 p.m. and stayed there for 30 minutes. While at his home, the police did not ask the defendant any questions. The defendant was given the opportunity to eat while at home, but he declined. The police officers did not consider the defendant to be in custody at this time.

The defendant and the same two detectives then drove to the Kansas Bureau of Investigation headquarters in Topeka for a polygraph examination. They arrived at 3:45 p.m. The defendant

was left with a KBI agent, Ron Blum, while the two detectives went to eat. The defendant understood why he was there and was read his *Miranda* rights again at 3:50 p.m. The defendant indicated he understood his rights, signed a waiver form, and agreed to speak. Agent Blum explained the defendant was there on a voluntary basis and was free to leave at any time. The defendant was questioned from 3:50 p.m to 6:15 p.m. Just before the defendant confessed to the crime, Agent Blum told the defendant that "whoever committed that type of crime it was not normal behavior" and told the defendant the person "may need some clinical help." When the defendant said, "Okay I did it" the two detectives were then called into the room, the defendant was again reminded of his rights, and he gave a written confession at 6:36 p.m. The defendant was then advised he was under arrest for aggravated battery, he was handcuffed and returned to Lawrence at 8:17 p.m.

The defendant objected to the admission of the confession at the preliminary hearing. The trial court overruled the objection and at a subsequent hearing ruled the confession was admissible.

The defendant argues his confession was the result of mental and physical coercion, and that subtle pressures were used by the police officers—picking the defendant up, leaving him without his own mode of transportation, taking his shoes, searching his room, and ultimately telling the defendant that the person who committed the crime needed clinical help. The defendant also argues that he was temporarily denied food.

The issue of the voluntariness of a confession was addressed in *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986), as follows:

"K.S.A. 22-3215(4) places the burden of proving that a confession or admission is admissible on the prosecution. . . . When a trial court determines at a hearing that a defendant's extrajudicial statement was freely, voluntarily and intelligently given and admits the statement into evidence at trial, the appellate court will not reverse such determination if it is supported by substantial competent evidence. *State v. Lilley*, 231 Kan. 694, Syl. ¶ 6, 647 P.2d 1323 (1982).

"When determining the voluntariness of a confession, one views the totality of the circumstances, including: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981).

"Under the Fourteenth Amendment due process voluntariness test, a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. *State v. Soverns*, 215 Kan. 775, 777, 529 P.2d 181 (1974)."

There is substantial competent evidence to support the trial court's finding the defendant's confession was admissible. The defendant was given *Miranda* warnings twice—at 11:37 a.m. and at 3:50 p.m. He was also reminded of those rights prior to giving his written confession. The defendant was questioned from 10:10 a.m. to 12:47 p.m., then from 3:50 p.m. to 6:36 p.m., a total of approximately five and one-half hours. While the defendant did drink only two Cokes from 10:00 a.m. to 6:00 p.m., he was offered food at his house at approximately 1:30 p.m. and he was offered food before leaving for Topeka at 2:35 p.m., and he declined. He requested a hamburger at 3:30 p.m. or 4:00 p.m., when the two detectives left to get something to eat. The detectives returned at approximately 5:00 p.m., and the defendant was not given that food until 6:40 p.m., but even then he did not eat it until he arrived in Lawrence at 8:17 p.m. The defendant, an eighteen-year-old high school graduate, did not appear to be under the influence of drugs or alcohol. Agent Blum testified the defendant was not overly tired, exhausted, or under duress. The confession was properly admitted into evidence.

The defendant's sixth issue is whether the trial court erred in not granting the defendant's motion for a judgment of acquittal made after presentation of all the evidence. The defendant argues the State failed to fulfill its burden to prove, beyond a reasonable doubt, that the defendant was sane at the time the crimes occurred.

Two relatively recent cases dealt with the granting or denial of a motion for a judgment of acquittal where the defendant asserted an insanity defense. *State v. Baker*, 236 Kan. 132, 689 P.2d 803 (1984); *State v. Boan*, 235 Kan. 800, 686 P.2d 160 (1984). In both cases this court ruled the trial court properly denied the defendant's motion. The applicable law was stated in *State v. Boan*, 235 Kan. at 811-12, as follows:

"In *State v. Nemecheck*, 223 Kan. 766, 576 P.2d 682 (1978), it is stated:

" 'There is presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. [Citation omitted.] The prosecution is never required to introduce evidence of sanity until some evidence is introduced which, if believed by the jury, could raise a reasonable doubt as to a defendant's sanity at the time the offense was committed. [Citations omitted.] This evidence may come from either the defendant or the state. [Citations omitted.] The term "evidence," however, does not include the insanity plea or opening statements. Neither rebuts the presumption of sanity. [Citations omitted.] . . .

" 'The presumption of sanity is rebutted when evidence is introduced which could raise a reasonable doubt concerning a person's sanity. (*State v. Johnson* [92 Kan. 441, 447, 140 Pac. 839 (1914).] At that point the question of sanity becomes a question for the jury, assisted by proper instructions. (*State v. Johnson*, 223 Kan. 237, 240, 573 P.2d 994 [1977]; *State v. Coltharp*, [199 Kan. 598, 603, 433 P.2d 418 (1967)]; *State v. Mendzlewski*, [180 Kan. 11, 14, 299 P.2d 598 (1956)]. If the jury has a reasonable doubt as to a defendant's sanity at the time the offense was committed, it is under a duty to acquit the defendant. (*State v. McBride*, 170 Kan. 377, 226 P.2d 246 [1951]; *State v. Nixon*, 32 Kan. 205, 4 Pac. 159 [1884]; *State v. Crawford*, [11 Kan. 32, 43 (1873)]. It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. In *State v. Gustin*, 212 Kan. 475, 510 P.2d 1290 (1973), we said:

" ' "A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." (Syl. 3.)

" 'In *State v. Chase*, 207 Kan. 352, 362, 480 P.2d 62 (1971), we quoted from *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961), as to the test for acquittal in an insanity defense case:

" ' " ' . . . [I]n order to remove this case from the jury's consideration, . . . "reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and . . . reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime." . . .' "

" 'Unless evidence of insanity is so great that a trial judge can rule the government could not convince a reasonable man it has sustained its burden of proof as to defendant's sanity, the issue should go to the jury, as we have recommended in the past. (*E.g., State v. Sagebiel*, 206 Kan. 482, 480 P.2d 44 [1971]; *State v. Chase*, [207 Kan. 352]; *State v. Coltharp*, [199 Kan. 598]; *State v. Mendzlewski*, [180 Kan. 11].)' pp. 767-69."

Here, in its case in chief, the State presented the testimony of two witnesses concerning the defendant's sanity. Dr. Modlin, a psychiatrist, had asked Dr. Schulman, a psychologist, to perform a standard clinical evaluation of the defendant. Dr. Schulman

concluded and testified that the defendant had a schizoid personality disorder. He stated that the defendant was a person who "does not relate to a lot of people easily, avoids the expression of feelings, in relationship with others is somewhat narrow, reserved, constricted, but a person who overall is in touch with reality, who overall knows what's going on about them and who leads their life in sort of a narrow chamber or narrow path and avoids a lot of excessive stimulation and things of that sort." Dr. Schulman was not asked to make any determination of insanity and could not conclude whether the defendant knew the difference between right and wrong at the time of the crime.

Dr. Modlin testified, in his opinion, the defendant did not suffer from a major depressive illness and was sane at the time of the crime. On rebuttal, as was previously discussed, Dr. Modlin testified, in his opinion, the defendant did not suffer from a "brief reactive psychosis."

The defendant presented the testimony of two witnesses on the issue of his sanity. Gloria Chediak, a clinical social worker, testified various events in the defendant's life were very stressful: physical and mental abuse by his parents, the move to a different school, health problems, the loss of a girlfriend, and the marriage of his brother. She concluded the defendant was "very depressed."

Dr. Elias Chediak, a physician-psychiatrist, testified extreme stress can affect a person's ability to distinguish between right and wrong. He diagnosed the defendant as suffering from two mental illnesses: prior to the incident the defendant suffered from major depression, and at the time of the incident he suffered from a "brief reactive psychosis." Dr. Chediak testified that, at the time the defendant struck the victim, he did not know the difference between right and wrong.

Applying the principles of law stated in *State v. Boan*, 235 Kan. 800, to the above evidence, we cannot say that reasonable men would necessarily possess reasonable doubt as to the defendant's sanity or conclude that the State failed to sustain its burden of proof as to the defendant's sanity. The testimony was that the defendant was sane, insane, schizoid, and depressed. The trial court did not abuse its discretion when it denied the defendant's motion for judgment of acquittal and allowed the issue of the defendant's sanity go to the jury.

The last issue has to do with the jury instructions. The defendant argues the trial court erred in failing to advise the jury that the disposition of the case is a matter of concern only for the court and not the jury.

The trial court, in Instruction No. 17, informed the jury as suggested in PIK Crim. 2d 54.10-A, "A person found not guilty because of insanity is committed to the State Security Hospital for safekeeping and treatment until discharged according to law." Because of this instruction, the trial court did not feel it was appropriate to give the complete PIK Crim. 2d 51.10: "Your only concern in this case is determining the guilt or innocence of the defendant. The disposition of the case thereafter is a matter for determination by the Court." The trial court, in Instruction No. 25, gave only the first sentence of PIK Crim. 2d 51.10. The trial court felt the two instructions were inconsistent and contradictory—telling the jury they must consider the disposition if the defendant were found not guilty because of insanity and also telling them disposition is not their concern.

The defendant argues that by not giving the complete PIK Crim. 2d 51.10, the trial court "left the door open" for the jury to consider disposition of the case.

K.S.A. 1985 Supp. 22-3428(6) requires an instruction such as PIK Crim. 2d 54.10-A when the defense of insanity is asserted. PIK Crim. 2d 54.10-A was approved in *State v. Wright*, 219 Kan. 808, 814, 549 P.2d 958 (1976). In *State v. Hamilton*, 216 Kan. 559, 564, 534 P.2d 226 (1975), this court cited with approval the language from *Lyles v. United States*, 254 F.2d 725, 728 (D.C. 1957), *cert. denied* 362 U.S. 943 (1960), *cert. denied* 368 U.S. 992 (1962):

"This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superin-

tendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts."

The purpose of PIK Crim. 2d 54.10-A, therefore, is to inform the jury what will happen if they determine the defendant is not guilty by reason of insanity. Its purpose is not to force the jury into considering disposition, but to educate them regarding the insanity defense. By failing to give the complete 51.10 instruction, the trial court did not leave the door open for the jury to consider disposition. The jury was instructed that its only duty was to determine guilt or innocence. We note that during voir dire the prosecutor asked the panel whether they understood that whatever its verdict, sentencing was a matter for the court. The record reveals there were no responses to the question. We find the defendant's argument is without merit.

The judgment of the lower court is affirmed.