No. 62,239

STATE OF KANSAS, *Appellee*, v. JAMES N. WHITE, *Appellant*.

(785 P.2d 950)

Opinion filed January 19, 1990.

*J. Patrick Lawless, Jr.*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, special appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*C. William Ossmann*, assistant district attorney, argued the cause, and *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MILLER, C.J.: This is a direct appeal by James N. White from his jury convictions in Shawnee District Court of first-degree

felony murder, K.S.A. 21-3401, and conspiracy to commit first-degree murder, K.S.A. 21-3302; K.S.A. 21-3401. He was sentenced to not less than 5 nor more than 20 years for conspiracy, to run concurrent with a term of life imprisonment for the murder conviction.

Defendant raises four issues on appeal: (1) whether a statement White made to Arizona authorities (the Arizona statement) was coerced; (2) whether the court erred in admitting into evidence a statement White made to Kansas authorities (the Kansas statement) after counsel had been appointed for him at his arraignment on an Arizona charge of possession of stolen property; (3) whether any error in the admission of the Kansas statement may be held to be harmless error beyond a reasonable doubt; and (4) whether there is sufficient evidence to support the conspiracy conviction.

## THE FACTUAL BACKGROUND

John Stacy was found dead in a Topeka hotel room on June 27, 1987. He had a broken nose, cuts on his right wrist, and twelve broken ribs. The coroner found the cause of death to be suffocation, suffered sometime between 10 p.m. on June 26 and 10 a.m. on June 27. Because of the absence of damage to the skin or soft tissues of the chest, the coroner concluded that Stacy's ribs were broken by means of blunt force, such as would be applied by someone sitting heavily on the chest. He also found it likely that complete suffocation was achieved by someone holding the bloodstained pillow, which had been found in the hotel room, over Stacy's face. Finally, he was of the opinion that Stacy's wrist had been cut after his death because only a very small amount of blood flowed from the wound.

Stacy's watch and car were missing, and only two dollars were found in his wallet. The car was found about 37 days later in Arizona. This led to information leading to the arrest of White and his companion, Sandra Hamilton, for possession of stolen property. While he was in custody, White gave statements admitting the murder to Arizona authorities (the Arizona statement) and later, while still in custody in Arizona, to Kansas authorities. Both statements were received in evidence, and form the basis for the issues raised on appeal. We will discuss both statements in connection with those issues.

In addition to White's statements, there was a great deal of evidence placing White and Hamilton at the scene of the homicide, and placing them in Stacy's company shortly before his death. A neighbor of Stacy's testified she saw two people fitting White's and Hamilton's descriptions go with Stacy into his trailer home on June 26. An acquaintance of Stacy's testified that on June 26, a young man fitting White's description appeared with Stacy at her home to pick up a painting. Another witness, a laundromat employee, testified that two people fitting White's and Hamilton's descriptions used the laundromat on the afternoon of June 26, while Stacy waited in his car. A bank teller testified that a young white man and a young white woman were with Stacy on the late afternoon of June 26 when Stacy withdrew $300 from his bank account at the drive-up window.

A Topeka hotel employee testified that two people fitting the description of White and Hamilton checked into the hotel on June 26. The woman fitting Hamilton's description signed the register and receipt in Stacy's name. A document examiner for the K.B.I. verified that the writing was Hamilton's. A waitress at the hotel testified that two people fitting the description of White and Hamilton had dinner with an older man fitting Stacy's description on June 26. She identified photographs of them, picked out White in a photographic lineup, and identified him in court. Latent fingerprints, one of White's and one of Hamilton's, were found in Stacy's car, along with a letter addressed to White.

White and Hamilton were charged with murder by Kansas authorities, extradited from Arizona, and driven back to Topeka by two Kansas deputy sheriffs. One of the deputies testified that she overheard several incriminating statements while White and Hamilton talked together in the back seat, and that none of the statements were made as a result of questioning, coercion, or inducement. The first statement was made while White and Hamilton were discussing possible sentences which might be imposed on them. White told Hamilton, "I did the crime, I have to do the time." The second statement occurred while the two were discussing cars. White indicated he preferred Chevys and Hamilton said she preferred Fords. White said, "I started to say that I wouldn't even steal a Ford, but I can't say that since the Escort

[Stacy's car] was a Ford." The third statement occurred while the two were discussing their bonds, and Hamilton said she could borrow $250,000 from someone. White asked her why, if she could get that kind of money, she had not done so before. He concluded, "If you had borrowed the money, we wouldn't have had to steal the car and everything." As they entered Topeka, White said it did not look familiar. Hamilton replied, "That's because we were never in Topeka. We just got off the ramp at the motel." The evidence at trial indicated the three had stayed at the Downtown Holiday Inn in Topeka, just off Interstate 70.

White was later arrested by local police in Arizona. One of the Arizona officers testified that White was arrested and handcuffed when he stepped outside a residence. White was immediately informed he was being detained for having committed the crime of possession of a stolen vehicle, and he was given the *Miranda* warnings. White acknowledged he understood his rights and told the officers he had taken the vehicle. The officer testified that at that time White appeared coherent, appeared to understand what was going on as the officer read him his rights and did not appear to be under the influence of alcohol or drugs. At the hearing before the trial court on the admissibility of this statement, White argued he was not given the *Miranda* warnings before he told the officers he took Stacy's car. The court found the officer's testimony more credible and admitted the statement. The admission of White's statement that he took the vehicle is not challenged by him on appeal.

## THE ARIZONA STATEMENT

The first issue is whether the trial court erred in receiving into evidence the Arizona statement. Briefly summarized, the Arizona statement shows that White said that he met Sandy Hamilton in Peru, Indiana. In late June 1987, the two of them left Peru and hitchhiked to Missouri. White first stated they found Stacy's car in a parking lot with the keys in the ignition. He said they got in and he drove to Long Beach, California, then on to Tijuana, Mexico, before arriving in Phoenix. He denied having ever met the owner of the vehicle.

Later in the statement, White changed his story. He said they met Stacy in a Denny's restaurant in Missouri. They rode with him, stopped at a Holiday Inn, ate dinner, and took showers.

Stacy then fell asleep. White and Hamilton stayed up. White stated, "[We] wanted to get away. We wanted to get out of state. We didn't want to walk and wanted to use a car." They jumped Stacy as he slept. Hamilton, a large person, held him down by sitting on him, and White, with some help from Hamilton, held a pillow over Stacy's head. They pounded his face and White cut Stacy's left wrist. They took the money from Stacy's wallet, over $300, and the car keys. Before leaving the hotel room, they wiped everything down to get rid of fingerprints.

White made this statement to two Arizona officers in an interrogation room at the Glendale, Arizona, police station shortly after his arrest. The interrogation was tape-recorded and the tapes were received in evidence and played to the jury, with a portion deleted. A transcription of the tapes was proffered by the State. The trial court did not receive the transcript in evidence, but the trial court examined the transcript and personally marked on the transcript that portion of the tapes which was deleted. Neither the tapes nor the transcript were made a part of the record on appeal; however, the transcript of the Arizona statement has been secured and reviewed.

Defendant contends the statement was coerced. The trial court listened to the tapes and conducted a full hearing on the admissibility of the statement. It found no coercion, and admitted the Arizona statement into evidence. When a trial court determines after a full pretrial hearing that an extrajudicial statement by an accused was voluntarily given and admits the statement into evidence at trial, the appellate court will not reverse the court's finding if it is supported by substantial competent evidence. *State v. Morris,* 244 Kan. 22, 23, 765 P.2d 1120 (1988).

The burden of proving a statement admissible is on the prosecution. K.S.A. 22-3215(4). The court must view the totality of the circumstances when determining the voluntariness of a statement, including (1) the manner and duration of the questioning; (2) the suspect's ability upon request to communicate with the outside world; (3) the suspect's intellect, age, and background; and (4) the fairness of the interrogating officers. *State v. Waugh,* 238 Kan. 537, 541, 712 P.2d 1243 (1986). Uncontested are the facts that White's handcuffs were removed during the interview, which began shortly after arrest, lasted only about an hour, and

was attended by only two officers. Also uncontested is the court's finding that White is of normal intelligence and was not mentally impaired or under the influence of drugs or alcohol.

According to the Arizona officers, White did not at any time request an attorney or evidence a desire to end the questioning. The officers testified the entire interview was tape-recorded. According to White, he requested an attorney before the tape began playing and again while the tape was stopped when one of the officers left the room for a few minutes. The trial court found no evidence of coercion or unfairness and found nothing that rebutted the officers' testimony. It found in odd contrast White's ready flow of talk on the tape in which he gives no sign of being coerced and never indicates a wish for counsel, and his testimony that he requested counsel several times—always when the tape recorder was not running. The court found White's version was not credible.

During the last part of White's interview, Hamilton was being questioned in an adjoining room. One of the officers told White that Hamilton was making a statement against him and that her statement did not mesh with his. Hamilton was crying, and the trial court noted that it could hear crying in the background during a portion of the tape.

During White's interrogation, one of the officers said in substance that the city had an ordinance against hindering an investigation, but that was something that could easily be taken care of. The trial court found this not to constitute such a promise or inducement as to render White's statement involuntary. The court said: "[At] most, it [was] merely a promise of collateral benefit with no assurance of benefit to the accused with respect to the crime under inquiry." We conclude that the officer's comment was not enough to render White's statement involuntary in the absence of other circumstances not present here. See *State v. Holloman,* 240 Kan. 589, Syl. ¶ 5, 731 P.2d 294 (1987). We conclude that the statement was voluntarily made and not the product of coercion, and that the trial court did not err in receiving the Arizona statement into evidence.

THE KANSAS STATEMENT

The second issue is whether the trial court erred in admitting the Kansas statement into evidence. The Kansas officers arrived

in Arizona two days after White was arrested. The officers gave White the *Miranda* warnings, and he agreed to talk with them. The parties agree the Kansas statement is more detailed but otherwise similar to the Arizona statement. We have not reviewed the Kansas statement as no copy has been provided with the appellate record.

White's objection to the admission of the Kansas statement is that, on the day before it was given, he was taken before a magistrate in Arizona on the charge of possession of stolen property. He asked for an attorney, and the court appointed counsel for him. This was known to the Kansas officers. Upon hearing the motion to suppress this statement, the trial court noted the Arizona court order appointing counsel was quite specific and contained the handwritten notation "only on [Ariz. Rev. Stat.] 13-1802," which would indicate that counsel's appointment was limited to representing White on charges pending against him in Arizona.

A number of Fifth and Sixth Amendment cases are helpful in determining this issue. The first is *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981), a Fifth Amendment case. The defendant was given the *Miranda* warnings and stated he did not wish to answer questions without a lawyer. The next day, however, officers gave him the *Miranda* warnings again and proceeded to question him. On that occasion, the defendant made incriminating statements. The United States Supreme Court held the admission of the statement violated the defendant's Fifth and Fourteenth Amendment rights to have counsel present during custodial interrogation. The defendant had declined to answer questions without counsel; he remained in custody throughout; and the questioning on the second day, initiated by the officers, concerned the same offense for which he was arrested. The case establishes the rule that, once a suspect has invoked his Fifth Amendment right to have counsel at a custodial interrogation, officers may not interrogate him, while he remains in custody, about the offense for which he is held unless the suspect himself initiates discussion concerning the offense.

In *Michigan v. Jackson,* 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), the defendants were arrested and arraigned

and had counsel appointed for them. The next day, before they had the opportunity to talk with counsel, they were given the *Miranda* warnings and were questioned by officers about the offenses. Although the case involved a Sixth Amendment right to counsel, the Supreme Court held the reasoning of *Edwards* applied with even greater force where counsel has been requested and appointed in a pending proceeding; therefore, their statements were inadmissible.

The trial court's decision to admit the Kansas statement in this case was made before the United States Supreme Court handed down its opinion in *Arizona v. Roberson*, 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988). Roberson was arrested at the scene of a burglary. In response to the *Miranda* warnings given him, he replied he did not want to answer any questions without a lawyer. Three days later, while he was still in custody, a different officer advised him of his *Miranda* rights, questioned him about an unrelated burglary, and obtained an incriminating statement. The trial court ruled the statement inadmissible and the Supreme Court affirmed. It applied *Edwards v. Arizona* and reasoned that the statement violated Roberson's Fifth Amendment right to have counsel present during custodial interrogation.

Two cases, decided since *Roberson*, are instructive. The first is our decision in *State v. Norris*, 244 Kan. 326, 331-32, 768 P.2d 296 (1989). In that case, we indicated our acceptance of the argument that *Edwards, Jackson*, and *Roberson* mandate a holding that police may not initiate interrogation where the suspect has invoked his right to counsel at arraignment on an unrelated charge, *so long as the suspect remains in custody*. Norris, however, was free on bond when he was arrested and interrogated on the second charge, and, thus, the rule did not apply.

White relies on *State v. Stewart*, 53 Wash. App. 150, 765 P.2d 1320 (1989). The facts in that case are similar to the facts in *Norris*, except that Stewart remained in custody and was still in custody when the statement was taken. The Washington Court of Appeals concluded: "Clearly, Stewart's Fifth Amendment right to counsel as a means of protecting his rights against compelled self-incrimination was violated when he requested counsel at his arraignment on a robbery charge, remained in continuous cus-

tody, and was subsequently interrogated on burglary charges." 53 Wash. App. at 156.

*Stewart*, however, has been reversed. In *State v. Stewart*, 113 Wash. 2d 462, 780 P.2d 844 (1989), the Supreme Court of Washington unanimously held that the Sixth Amendment request of Stewart for counsel in the robbery case did not amount to an assertion of his Fifth Amendment right to have counsel present when questioned about the burglaries. The Washington court carefully distinguished between the Sixth Amendment right to counsel in a particular pending judicial proceeding and the Fifth Amendment right to counsel to guard against coerced, and therefore unreliable, confessions obtained during custodial interrogation. The court carefully reviewed the cases discussed above, and others, and concluded the confession to the burglaries was admissible. It should be pointed out, however, that the burglaries were wholly unrelated to the robbery for which the accused was arrested and confined.

A discussion of the cases from other jurisdictions would but prolong this opinion. Here, White clearly invoked his Sixth Amendment right to counsel when he asked for the appointment of counsel in the pending Arizona proceeding, wherein he was charged with the unlawful possession, in Arizona, of stolen property. The stolen property was the motor vehicle which White appropriated in Kansas, immediately following the homicide of the owner. It is readily evident, upon reading the transcript of the Arizona statement, that the Arizona officers knew from the outset that White was suspected of murdering the owner of the motor vehicle in Kansas. The entire Arizona custodial interrogation focuses on that event, rather than the Arizona charge of unlawful possession of stolen property. White was charged in Kansas with aggravated robbery for taking the Ford Escort automobile, car keys, and cash from John Stacy by force and by inflicting bodily harm upon him. Under these circumstances, we conclude that rather than being wholly unrelated, as were the robbery and the burglaries in *Stewart*, the Arizona and Kansas offenses were clearly related. Therefore, under the rule announced in *Michigan v. Jackson,* the Kansas statement was inadmissible. The trial court erred in admitting it into evidence.

## HARMLESS ERROR

The third issue is whether the admission of the Kansas statement constituted harmless error. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Eaton*, 244 Kan. 370, 385, 769 P.2d 1157 (1989). Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Alexander*, 240 Kan. 273, 276, 729 P.2d 1126 (1986).

As we noted earlier in this opinion, the Kansas statement is not included in the record on appeal. It is a familiar rule that an appellant has the burden of furnishing a record on appeal which affirmatively shows that prejudicial error occurred in the trial court. The brief of appellant appears to quote from the Kansas statement, yet that statement is not part of the record before us. From what little information we have on the matter, it also appears that the Kansas statement is but a more detailed account of the facts set forth in the Arizona statement. The Arizona statement and the other evidence properly admitted at trial, including the testimony of many witnesses, establish an overwhelming case against the defendant. We therefore declare the error in admitting the Kansas statement harmless beyond a reasonable doubt. See *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981).

## THE CONSPIRACY CONVICTION

The final issue is whether there is substantial competent evidence to support White's conviction of conspiracy. To establish that charge, the State had to prove that White agreed with Hamilton to murder John Stacy and that either Hamilton or White later committed an overt act in furtherance of the object of that agreement. K.S.A. 21-3302. Like other offenses, conspiracy may be established by direct or circumstantial evidence. When the sufficiency of the evidence is challenged on appeal, the standard of review is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond

a reasonable doubt. *State v. Smith*, 245 Kan. 381, Syl. ¶ 5, 781 P.2d 666 (1989). Reviewing the evidence in this record in that light, we conclude that there is substantial competent evidence to support White's conviction of the offense of conspiracy.

The judgment is affirmed.