No. 64,206

STATE OF KANSAS, *Appellee*, v. JAMES E. GRAHAM, *Appellant*.

(799 P.2d 1003)

Opinion filed October 26, 1990.

*Richard G. Tucker*, of Parsons, argued the cause and was on the brief for appellant.

*John K. Bork*, assistant attorney general, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: James E. Graham (defendant-appellant) appeals his conviction of first-degree murder (K.S.A. 1989 Supp. 21-3401), claiming the District Court of Labette County erred by: (1) failing

to sustain his motion for dismissal of an unverified complaint; (2) admitting his statements to law officers; (3) failing to grant a new trial based on the prejudicial remarks by the prosecution made in closing argument; (4) admitting one of the autopsy photographs; and (5) allowing him to be convicted on insufficient evidence.

Colleen Graham, the victim, and her husband James Graham had lived in Parsons for approximately twenty-five years. They owned a tavern, a liquor store, and seven rental properties. Graham, a retired sheet metal worker, ran the tavern while Colleen, who was employed as a supervisor at the Kansas Army Ammunition Plant, managed the liquor store.

At 8:14 p.m. on August 6, 1988, the Parsons Police Department received a call from Louella Marzette, Colleen's sister, who expressed concern about her sister. At 8:20 p.m., the police received a call from Graham. He informed the police that his wife had been shot.

Graham was at the residence when the officer arrived. There was evidence of a forced entry through the rear door of the home. Inside the house some furniture was tipped over and various items of personal property were strewn about. Nothing was reported stolen and the items usually taken in a burglary, *i.e.*, guns, money, and electronic equipment, were still in the home. The officers found Colleen's body in the bed. She had been shot in the head. The county coroner estimated Colleen had died earlier that day between the hours of 6:00 a.m. and 10:00 a.m.

To insure that nothing would be disturbed, the police suggested that Graham wait at the police station while they processed the crime scene. Graham was driven to the station, where he waited in the unlocked patrol lieutenant's office. While waiting at the station, Graham was not watched or restrained in any manner. No one explained why on appeal, but defendant was read his *Miranda* rights and signed a waiver of those rights at 10:15 p.m.

At 1:30 a.m., a K.B.I. special agent, who had been called to assist at the crime scene, and a Parsons detective were informed that Graham wanted to talk to someone. During their conversation Graham denied killing his wife. He told the officers that when he left home, before 9:00 a.m., to go to the liquor store, Colleen was fine. Graham stated he remained at the tavern until he returned home to eat about 6:00 p.m. When officers informed

Graham that he had been seen near his residence at 2:00 p.m., Graham remembered he had gone home to pick up some disinfectant to clean the tavern but had not checked on his wife. He said when he left, the house was locked and in its normal condition. Graham said it was when he went home again at about 6:00 p.m., that he found his wife's body in bed. Graham told the officers that after discovering her body he went to the kitchen to fix some soup and that he did not call the police right away because he was too upset. After the conversation, Graham left the police station and was taken to his tavern.

After their conversation with Graham, the officers returned to the residence but found no soup cans or evidence of soup having been prepared. A search warrant was then obtained to check the residence for the murder weapon. In the bedroom, several rifles and shotguns were in the upper section of a gun cabinet. A key found behind the bedroom door unlocked the lower drawer of the gun cabinet. A revolver was found in the drawer. The revolver was sent to the K.B.I. lab in Topeka for testing. After ballistics tests determined that bullets fired from the revolver found at the defendant's residence matched the bullet taken from the victim's body, Graham was arrested on August 15, 1988.

During the trial Graham's testimony conflicted with that of some of the State's witnesses. James R. "Lucky" Graham, the son of Colleen and James E. Graham, testified that he had lived with his parents until June or July 1988 when he had moved out. He did not have a key to the house. He testified he saw his mother at the tavern on August 5 around 9:00 p.m. When the tavern closed, he and his mother went to Cynthia Cullom's house. They arrived at Cynthia's house between 1:00-1:30 a.m. and stayed for about an hour. Lucky testified that when Colleen left Cynthia's house about 2:00 a.m., he followed her home but did not go in. After driving around, he returned to his parents' house at 2:30 a.m. Lucky testified that when he entered the house, his parents were at the dining room table discussing the employment of Cynthia Cullom. His father had a .38 caliber snub nose revolver on the table. Lucky testified his father had two pistols of this type. His father carried one of the pistols with him when transporting large sums of money. The other pistol was kept in a locked gun cabinet located in the parents' bedroom.

There was no evidence that the pistol Lucky saw was the murder weapon.

Lucky further testified that when he called his mother on August 6 between 9:00 and 9:30 a.m., his father answered the phone and said he did not know where Colleen was. About 12:00 or 12:30 p.m., Lucky stated he went by his parents' house and rang the doorbell. When there was no answer, he went to the tavern, where his father again told him he did not know where Colleen was.

Graham's testimony also conflicted with that of Gina Green, who worked at Graham's liquor store from 9:00 a.m. to 6:00 p.m. Gina testified that on Saturday, August 6, Graham picked her up about 5 minutes before 9:00 a.m. They arrived at the liquor store about 9:05 a.m. Graham stayed for about five minutes and then left. Gina testified Graham was driving Colleen's car rather than his pickup but this was not unusual. Graham parked the car between the liquor store and the tavern. This prevented her from observing the car. She did not know if Graham had left the tavern during that day, but said Graham was at the tavern both times she had gone there that afternoon to get food.

Gina testified that Lucky came to the liquor store to ask her if she had seen his mother. Colleen usually came by the liquor store around noon on Saturdays. After Lucky left she called Colleen at home but no one answered. Gina said she returned to the tavern about 7:00 p.m. to ask Graham why Colleen had not relieved her at 6:00 p.m. as was usual. Graham told Gina he did not know where Colleen was but he would check. Gina estimated Graham was gone from the tavern about five or ten minutes. When Graham returned he told her Colleen was dead and it appeared someone had broken into the house. When asked by the prosecutor how long it would take Graham to get from the tavern to his home, Gina estimated at least five minutes.

· Louella Marzette testified that after being unable to contact her sister Colleen on Saturday, August 6, 1989, she drove to the liquor store and found Gina Green crying. Gina told her that Graham had told her Colleen was dead. Louella and her husband then drove to the Graham house and found Graham, who had just arrived, at the house. Graham told her that he did not know where Colleen was. Louella stated she and her husband went to

their home and called her other siblings in an attempt to locate Colleen before calling the police after 8:00 p.m.

The KBI agent who had interviewed Graham in the early morning hours of August 7, testified Graham denied telling either his son, Lucky, or Colleen's sister, Louella, he did not know where Colleen was.

The State presented testimony of a Parsons police officer who had previously responded to a disturbance at the Grahams' liquor store on May 24, 1988. The officer testified that when he and another officer arrived they found the liquor store door locked and Colleen inside. Colleen told them, because of problems with her husband, she had thrown him out of the liquor store and locked the door. About two minutes later Graham arrived and stated, "If I would have had my gun, I would have killed her," and "You know me, and you know if I get mad, it's not going to matter who gets in the way." The officer testified he and the other officer left after Graham calmed down, Colleen left, and Graham reopened the store.

Graham testified he left the tavern on August 6, 1988, about 12:30 a.m. and went home to bed. When his wife came home, about 2:30 a.m., he got out of bed and discussed Cynthia Cullom's employment at the liquor store. He stated their discussion at the dining room table was just disagreement over business. Graham did not remember Lucky coming home or that his pistol was laying on the table during their conversation. Graham stated that after their conversation they went to bed and he woke up around 7:00-7:30 a.m. Though Colleen was asleep, he awakened her to discuss the amount of money he should take to the businesses. Graham estimated he left home between 8:40 and 9:15 a.m. to pick up Gina Green, the liquor store employee. Graham said the front door and the back door were locked when he left.

Graham testified he picked up Gina Green, drove her to the liquor store, and helped her open up. He left about fifteen minutes later, went to the tavern, checked inventory, and cleaned up the premises. Graham said the only time he left the tavern was to go to the bank and to pick up Willie Porter, who helped him clean. Graham said Colleen normally slept until noon or 1:00 p.m. on Saturday. He further testified, since he was not at home between 9:00-9:30 a.m., he could not have talked to Lucky on

the home telephone. He also denied that Lucky had come into the tavern on August 6, 1989. Graham did admit that he had trouble with his memory.

Graham testified that Gina Green came into the tavern at 6:30 p.m. and asked why Colleen had not come to the liquor store at 6:00 p.m. to relieve her. He told her he would find out what was wrong, left about fifteen minutes later, went to the house, entered through the front door, and found Colleen dead in their bed.

Graham further stated that, when he discovered his wife's dead body, he panicked and did not know what to do. He returned to the liquor store and told Gina his wife was dead. He then went to the tavern and, after telling the people in the tavern that his wife was dead, closed the tavern.

Because he feared someone was in the house, Graham stated he asked James Cunningham to return with him to the house. Upon their arrival, they found the windows in the back of the house broken and a back door panel kicked out, leaving a space large enough for a man to crawl into the house. After checking for any remaining intruders he took Cunningham, who had not entered the house, back to the tavern and then returned home, arriving at the same time his sister-in-law arrived. She asked where Colleen was. In an effort to spare her feelings, he told her he did not know. Graham stated he then went into the house, looked at Colleen's body, and called the police.

Graham testified that he was taken to the police station in the back seat of a police car. Though he could not recall if he was handcuffed, he did remember he was not told whether he was under arrest. Because no one told him he could leave the station, he assumed that he was under arrest. He stated, although he signed the *Miranda* waiver at 10:15 p.m., he understood neither his rights nor what he was signing. Graham testified he had not had any sleep since awakening at 7:15 a.m. that day, and that he did not have his medication, which he was to take several times a day, with him at the station. About 1:00 a.m., in an attempt to find why he was being held at the station, Graham said he asked to talk to someone. Immediately officers began to question him about killing his wife. The questioning lasted for more than an hour. Graham denied he ever told the officers that

after he found his dead wife he had fixed himself some soup, but said if he did make that statement, it was because of the stress he was under. Graham testified he loved his wife and did not kill her.

The jury found James Graham guilty of first-degree murder. Graham appeals.

### WAS THE COMPLAINT PROPERLY AMENDED?

The complaint charging Graham was filed on August 15, 1988, and signed by the county attorney of Labette County; the complaint was not verified. After the jury was selected but before opening statements were given, Graham's attorney moved to quash the warrant and dismiss the case because of the defective complaint. He argued that, since the complaint charging his client was not "sworn to" pursuant to K.S.A. 1989 Supp. 22-2202(8), it was defective. He claimed, because he timely objected, the court lacked jurisdiction to conduct the trial and the proceedings must be dismissed. The trial court denied Graham's motion and then granted the State's motion to amend the unverified complaint.

Generally, a criminal prosecution is commenced by the filing of a complaint. The complaint is a written statement under oath of the essential facts constituting a crime. K.S.A. 1989 Supp. 22-2202(8). The lack of verification on the complaint is not a defect that deprives the court of jurisdiction. *State v. Fraker*, 242 Kan. 466, 467-68, 748 P.2d 868 (1988); *State v. Searle*, 136 Kan. 177, 179-80, 14 P.2d 636 (1932); *State v. Alton*, 127 Kan. 832, 275 Pac. 166 (1929). Though Kansas statutes require a complaint to be verified, that defect in the complaint can be waived. The right to challenge the lack of verification of the complaint can be lost through inaction.

K.S.A. 1989 Supp. 22-3208(3) requires defenses or objections based on defects in the institution of the prosecution or in the complaint, with certain exceptions, to be raised by motion before trial. The district court may permit a complaint or information to be amended at any time before the verdict or finding if no additional or different crime is charged and the substantial rights of the defendant are not prejudiced. K.S.A. 22-3201(4).

On appeal Graham claims neither that his substantial rights were prejudiced nor that an additional or different crime was

charged in the amended complaint. The original complaint sufficiently informed him of the charge against him and protected him against double jeopardy. *State v. Jones,* 242 Kan. 385, 394, 748 P.2d 839 (1988). Rather than objecting to the unverified complaint prior to trial as required by statute, he waited until after the jury was sworn. Since his objection was not timely and Graham suffered no prejudice, the district court had jurisdiction to proceed with the trial and the power to permit the State to amend the complaint.

## WERE GRAHAM'S STATEMENTS MADE DURING THE INTERVIEW WITH POLICE OFFICERS ADMISSIBLE?

Graham contends his being transported to the police station where he was interviewed by law enforcement officers resulted in a custodial interrogation that produced involuntary statements. Graham claims the State was improperly allowed to use his exculpatory statements to impeach his credibility. He reasons since the State's case was based solely on circumstantial evidence, the admission of these inconsistent statements improperly obtained during a custodial interrogation deprived him of a fair trial.

The prosecution has the burden of proving whether a confession or admission is admissible. K.S.A. 22-3215(4). When determining the voluntariness of a statement, the court must view the totality of the circumstances including (1) the manner and duration of the questioning; (2) the suspect's ability upon request to communicate with the outside world; (3) the suspect's intellect, age, and background; and (4) the fairness of the interrogating officers. *State v. White,* 246 Kan. 28, 32, 785 P.2d 950 (1990). Graham was a 56-year-old businessman. He was aware of his surroundings during the interview. Though informed of his rights, Graham neither requested an attorney nor asked to make a telephone call. Graham made intelligible responses and did not appear to be or indicate that he was suffering from any severe disabilities at the time of the interview.

The trial court, after a pretrial hearing, determined Graham's claim that he was in custody was not supported by the facts. It found Graham was not ordered to go to the station but voluntarily went to the police station while officers processed the crime scene. Graham was not restrained while being transported to the

police station or while he waited unwatched in an unlocked office. It was Graham who initiated the interview which lasted an hour. After the interview Graham was driven to his tavern. The police neither charged nor arrested Graham until several days after the interview.

A person is not arrested or in custody until significant restraints have been placed upon that person's freedom of movement. *State v. Bohanan,* 220 Kan. 121, 128, 551 P.2d 828 (1976). In *State v. Jones,* 246 Kan. 214, 215, 787 P.2d 726 (1990), we determined a defendant who voluntarily went to the police station and was interviewed for approximately an hour, then left the station without restraint being placed on his movement, was not in police custody. As in *Jones,* the trial court determined that Graham was not in custody when he made the statement.

When after a full pretrial hearing a trial court determines that an extrajudicial statement by an accused was voluntarily given and admits the statements into evidence at trial, the appellate court will not reverse the trial court if its findings are supported by substantial competent evidence. *State v. White,* 246 Kan. 28, Syl. ¶ 1.

We agree with the trial court's finding that Graham's statement was not the product of coercion. The trial court's finding of voluntariness is supported by substantial competent evidence.

## DID THE COURT ERR IN ADMITTING AN AUTOPSY PHOTOGRAPH INTO EVIDENCE?

The admission of photographs into evidence is within the discretion of the trial court. *State v. Kendig,* 233 Kan. 890, 666 P.2d 684 (1983). Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Special care must be taken by the trial court in admitting photographs taken after the pathologist has intervened. *State v. Lucas,* 243 Kan. 462, Syl. ¶ 7, 759 P.2d 90 (1988).

During the trial the State introduced two autopsy photographs and a diagram prepared by the pathologist. The diagram showed the victim's head in various positions to demonstrate to the jury the path of the bullet through the skull. One photograph shows the direction of the bullet's path through the skull by use of a probe. The other photograph is of the victim on the autopsy table

with a scalpel lying near her head. Graham argues that this photograph is morbid and has no probative value.

The admission into evidence of photographs of homicide victims must necessarily rest largely in the discretion of the trial judge. In each case, it is the trial judge who determines whether the photographs serve a proper purpose in the jury's enlightenment. His action will not be disturbed by an appellate court unless there was an abuse of discretion. *State v. Ruebke,* 240 Kan. 493, 516-17, 731 P.2d 842 (1987).

We have viewed the photograph and determined it is not gruesome. The photograph was taken prior to the autopsy and the blood on the body is the result of the shooting, not the autopsy. The photograph is relevant to the pathologist's testimony and assisted the jury's understanding of that testimony. The trial court did not abuse its discretion by admitting the photograph into evidence.

## WAS THE PROSECUTION'S STATEMENT IN CLOSING ARGUMENT GROUNDS FOR A MISTRIAL?

Fair comment on evidence should not be discouraged. *State v. McClain,* 216 Kan. 602, 608, 533 P.2d 1277 (1975). The prosecution can make comments on the evidence so long as the comments are confined to the evidence and reasonable inferences which can be drawn from the evidence. A prosecutor is guilty of gross misconduct if the prosecutor asserts facts to be true which he or she knows, or should have known, to be false. *State v. Buckland,* 245 Kan. 132, 140, 777 P.2d 745, (1989).

Because the State's evidence was circumstantial, Graham contends the prosecutor's statement of his opinion of the testimony in his closing argument to the jury was extremely prejudicial and denied him a fair trial. During closing argument to the jury, Graham objected when the prosecutor stated:

". . . Now, if the defendant were to tell you that he saw it snowing, that would be direct evidence that it snowed. But I would submit to you if the defendant in this case said it snowed, you could check that snow to make sure it's cold and wet before you believe that.

"The evidence that points to the defendant in this case. We have the time of death. We have the gun. We have the threats he made. The victim herself, and the lies the defendant told, and his memory of convenience.

And that's a strong word, the lies and liar, but in this case the defendant has tried to brand numerous people as a liar."

The State urges these comments were not the prosecutor's opinion but under the facts fair comments on Graham's credibility.

The prosecutor's remarks refer to the defendant's statement that those who testified against him were lying. We find, because of Graham's inconsistent statements, the remarks are a reasonable inference which can be drawn from the evidence admitted during Graham's trial.

## WAS THE EVIDENCE SUFFICIENT FOR A CONVICTION?

Graham claims that the State's circumstantial evidence was weak and was not supported by other substantial and competent evidence needed to support a conviction of first-degree murder. Specifically he relies on the fact there was no fingerprint evidence introduced, it was impossible for him to be at home between 9:00 and 9:30 a.m. as testified to by Lucky, and the inconsistencies in his statements made at the police station were caused by the stress imposed upon him.

A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989). When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Smith*, 245 Kan. at 392. We have reviewed the record and, after viewing all the evidence in the light most favorable to the prosecution, conclude that there is sufficient evidence for a rational factfinder to find the defendant guilty beyond a reasonable doubt.

Affirmed.