NOT DESIGNATED FOR PUBLICATION

No. 115,031

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CORNELIO SALAZAR-MORENO,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed January 27, 2017. Affirmed in part and vacated in part.

*Richard Ney*, of Ney & Adams, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., PIERRON and HILL, JJ.

*Per Curiam*:  Cornelio Salazar-Moreno appeals the district court's denial of his motion filed pursuant to K.S.A. 60-1507 alleging ineffective assistance of counsel. Salazar-Moreno was convicted of rape, two counts of aggravated indecent liberties with a child, and adultery. Prior to trial he retained private counsel. However, the attorney Salazar-Moreno hired was later appointed in a federal case. Realizing that he would not be able to handle both cases, the attorney introduced Salazar-Moreno to another attorney who agreed to represent him both at trial and on direct appeal. After Salazar-Moreno was convicted, an appeal was filed, and this court, in an unpublished opinion, affirmed Salazar-Moreno's convictions.

1

Salazar-Moreno subsequently filed his present K.S.A. 60-1507 motion, raising multiple claims of ineffective assistance of trial counsel and one claim of ineffective assistance of appellate counsel. After an evidentiary hearing, the district court found that while the performance of both attorneys was deficient, Salazar-Moreno failed to show prejudice. On appeal, Salazar-Moreno claims (1) the district court erred in failing to find he was effectively denied the counsel of his choice; (2) Kerns and Battitori provided ineffective assistance of counsel before and during his trial; and (3) he was prejudiced by counsel's deficient performance, entitling him to a new trial.

While we find Salazar-Moreno's conviction and sentence for adultery was in error and therefore vacate that conviction and sentence, we affirm the district court in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

The charges in this case arise from incidents occurring in November and December of 2007. The then 13-year-old victim, D.M.D., alleged that in the first incident Salazar-Moreno fondled her breasts after taking her to a store to get something for a school project. In the second incident, D.M.D. was at Salazar-Moreno's house when he allegedly fondled her breasts and vagina while she checked her e-mail on a computer. The third incident allegedly occurred on December 30, 2007, when Salazar-Moreno, while on his lunch break, came to the house where D.M.D. was babysitting and had sexual intercourse with her.

In early 2008, D.M.D. told one of her friends that she had lost her virginity to Salazar-Moreno. In March 2008, another friend of D.M.D., who had learned about D.M.D. and Salazar-Moreno, wrote D.M.D.'s mother a letter asking the mother to call her. When D.M.D.'s mother received the letter she called the friend, who told her that Salazar-Moreno had taken D.M.D.'s virginity. When D.M.D.'s mother and father asked

2

her if what they had heard was true, D.M.D. began to cry and told them that Salazar-Moreno had come to house where she was babysitting.

D.M.D.'s family filed a report with the Hutchinson Police Department, and a police detective was assigned to investigate the case. As part of the investigation, D.M.D. was interviewed at a child advocacy center and was examined by a local pediatrician, Dr. Ellen Losew. Both D.M.D. and her mother provided written statements to police. The police detective investigating the case determined the time and distance between the warehouse where Salazar-Moreno worked and the house where D.M.D. had been babysitting. He also visited the house to examine the scene of the alleged rape because D.M.D. had reported that she bled and had to clean blood from the carpet. A forensic scientist from the Kansas Bureau of Investigation (KBI) tested the carpet for signs of blood. The police also obtained records from D.M.D.'s and Salazar-Moreno's cellphones.

Salazar-Moreno was initially charged in April 2008. In October 2010, the State amended the complaint for the third and final time, charging Salazar-Moreno with one count of rape, two counts of aggravated indecent liberties with a child, and one count of adultery. Salazar-Moreno retained Tom Arnold to represent him at his first appearance. At the preliminary hearing, however, in which Salazar-Morino was bound over, a public defender represented him. Then, in July 2008, Salazar-Moreno retained Kurt Kerns to represent him at trial. About a year later, the United States District Court appointed Kerns to represent a defendant in a federal case. Realizing that his involvement in the federal case would prevent him from adequately representing Salazar-Moreno, Kerns met with Salazar-Moreno and recommended that Eddie Battitori be brought on board to assist in his defense. Salazar-Moreno agreed to the arrangement, and over the next several months, Battitori represented him at several pretrial hearings and filed several pretrial motions.

More than 2 years after he was initially charged, Salazar-Moreno's jury trial began in January 2011. The trial was conducted over 4 days, with the State and Salazar-Moreno calling several witnesses to testify. Dr. Losew testified that she noticed D.M.D. had a well-healed cleft or angulation of her hymen which extended to the vaginal wall. She also testified that while she could not say exactly what caused the injury, in her opinion D.M.D.'s report was consistent with the examination's findings and was suspicious for child sexual abuse. D.M.D. also testified about the three incidents and briefly mentioned on direct examination that she was scared of Salazar-Moreno. On cross-examination, Battitori asked D.M.D. why she was afraid of Salazar-Moreno, and D.M.D. replied that she had heard of talk about him beating up someone from work and buying guns. Battitori asked D.M.D. if she thought Salazar-Moreno was going to shoot her or beat her up, and D.M.D. replied that she did not know. D.M.D. also testified that Salazar-Moreno had never been mean to her in any way and that he had never threatened her in any way.

D.M.D.'s mother, father, and aunt each testified that after the police report had been filed, Salazar-Moreno's wife, Dawn, called D.M.D.'s mother to ask how D.M.D. was doing. D.M.D.'s mother put the phone on speaker so that everyone—including D.M.D.—could hear what Dawn had to say. Dawn said that Salazar-Moreno admitted to her that he had sex with D.M.D. The State also called Dawn as a witness. When asked about her conversation with D.M.D.'s mother, Dawn testified that Salazar-Moreno denied having sex with D.M.D. On cross-examination, Battitori asked Dawn if she was aware that D.M.D.'s mother, father, and aunt all testified that she told D.M.D.'s mother that Salazar-Moreno admitted to having sex with D.M.D. and whether she would agree with such testimony. Dawn testified that she would disagree and clarified that she had never said anything like that.

Other than Dr. Losew's testimony, there was very little physical evidence presented. Salazar-Moreno called the KBI forensic scientist as a witness, who testified no traces of blood were found on the carpet where D.M.D. testified she had bled. The phone

4

records of Salazar-Moreno and D.M.D. were also introduced into evidence, which showed that D.M.D. and Salazar-Moreno had called each other 145 times and talked for more than 1,600 minutes in December 2007.

Ultimately, the jury found Salazar-Moreno guilty on all counts. Battitori filed several posttrial motions on Salazar-Moreno's behalf, including a motion for dispositional and downward durational departure. Each of Battitori's motions was denied. The district court sentenced Salazar-Moreno to three concurrent life sentences and a concurrent 30-day jail sentence. Battitori filed a notice of appeal for Salazar-Moreno and was later retained to handle his direct appeal. On appeal, Salazar-Moreno raised issues regarding Dr. Losew's testimony and the district court's failure to grant a mistrial. *State v. Salazar-Moreno*, No. 106,555, 2013 WL 5925894, at *2-11 (Kan. App. 2013) (unpublished opinion). This court refused to consider the testimonial issue due to the lack of a contemporaneous objection and found that the district court had not abused its discretion in denying any of Salazar-Moreno's motions for mistrial. 2013 WL 5925894, at *4, 11. Battitori did not file a petition for review with the Kansas Supreme Court, and the mandate was filed with the district court on December 10, 2013.

In October 2014, Salazar-Moreno filed his present K.S.A. 60-1507 motion, alleging the same errors that he raises on appeal in addition to a claim that Battitori provided ineffective assistance of appellate counsel. The district court held an evidentiary hearing at which Kerns, Battitori, Dawn, and Salazar-Moreno testified. Kerns testified he had met with Salazar-Moreno at least five times, probably more, but he had not kept any records of those meetings. Besides meeting about taking over the case and at court appearances, Battitori could only recall one meeting between Salazar-Moreno and him. Battitori testified that he could not recall how many substantive meetings about the case he had with Salazar-Moreno but he knew it was not none. He also testified that Salazar-Moreno never complained about Kerns not representing him at trial.

5

Salazar-Moreno testified at the hearing that Kerns had told him two attorneys were better than one. He also said that a few days before trial he called to confirm that Kerns was ready for trial. Kerns said that he was not ready and that he was leaving the country that night, but he also mentioned that Battitori was ready for trial. On the first day of trial, Salazar-Moreno asked Battitori where Kerns was, and Battitori said that Kerns was out of the country. Salazar-Moreno admitted he did not tell the district court that he wanted Kerns present at trial, claiming that he assumed it was the district court's job to notice that one of his attorneys was not there and did not know he was supposed to say anything.

Dawn testified that she realized Kerns was not going to be involved in the case when Battitori showed up to one of the hearings by himself. She also said that neither Kerns nor Battitori interviewed her about what she knew. When asked if she knew that D.M.D. had claimed there had been an incident of inappropriate sexual contact when Salazar-Moreno had taken D.M.D. to the store, Dawn responded that she was aware of that and had been before trial but that Battitori had not asked her about it. She testified that, if he had asked, she would have told Battitori that her daughter was with Salazar-Moreno and D.M.D. that day.

Following the hearing, the district court issued a written order with its findings of fact and conclusions of law. The district court determined that while the performance of both Kerns and Battitori was deficient, Salazar-Moreno had failed to establish prejudice. Specifically, the district court concluded: "The victim was composed and articulate as she described each of the incidents. Her testimony was corroborated by the testimony of her mother, her physician, and petitioner's cellphone records." As for the claim of ineffective assistance of appellate counsel, the district court found that Salazar-Moreno had been prejudiced by Battitori's deficient performance and granted him a new direct appeal.

6

After the district court issued its order, Salazar-Moreno filed a motion to alter or amend the judgment. Salazar-Moreno argued the district court had erred in by applying the wrong standard to his first two claims of ineffective assistance of counsel. According to Salazar-Moreno, the district court should have presumed prejudice due to Kerns' and Battitori's deficient performance. The district court held a brief hearing on the motion and ultimately denied it, later issuing a written journal entry reiterating that both Kerns and Battitori performed deficiently regarding each claim but that the presumption of prejudice did not apply. The district court again found that Salazar-Moreno had failed to establish he had been prejudiced by Kerns' and Battitori's deficient performance. The district court also reaffirmed its finding that Battitori had provided ineffective assistance as appellate counsel and reaffirmed its decision to grant Salazar-Moreno a new direct appeal.

Salazar-Moreno timely appeals.

## DID THE DISTRICT COURT ERR IN FAILING TO FIND SALAZAR-MORENO WAS DENIED HIS COUNSEL OF CHOICE?

If the district court conducts a full evidentiary hearing to consider the claims alleged in a K.S.A. 60-1507 motion, it must issue findings of fact and conclusions of law. Supreme Court Rule 183(j) (2015 Kan. Ct. R. Annot. 271). We review the district court's findings of fact to determine whether they are supported by substantial competent evidence and whether they are sufficient to support the district court's conclusions of law. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). The district court's conclusions of law are reviewed de novo. *Thompson v. State*, 293 Kan. 704, 716, 270 P.3d 1089 (2011).

Salazar-Moreno's first complaint is that he was denied right to counsel of his choice under the Sixth Amendment to the United States Constitution when his retained attorney, Kerns, failed to represent him during the trial and the district court failed to

secure a knowing and voluntary waiver of his constitutional right to counsel of his choice. Alternatively, he argues Kerns was ineffective and that counsel's ineffectiveness prejudiced him.

The Kansas Supreme Court has found that the United States Supreme Court recognizes three categories of ineffective assistance of counsel claims. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

> "The first category includes cases in which it is claimed that the attorney's performance was so deficient that the defendant was denied a fair trial. The second category applies when the assistance of counsel was denied entirely or denied at a critical stage of the proceeding. The third category includes situations where the defendant's attorney 'actively represented conflicting interests.'" *State v. Galaviz*, 296 Kan. 168, 181, 291 P.3d 62 (2012) (quoting *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 [2002]).

Only the first two categories apply to this case. Deficient performance claims in the first category are controlled by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). *Sola-Morales*, 300 Kan. at 882; see also *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland*). To prevail on this type of claim, the movant must show that (1) under the totality of the circumstances defense counsel's performance was deficient and (2) the deficient performance resulted in prejudice, meaning there is a reasonable probability that the jury verdict would have been different had defense counsel's performance not been deficient. See *Strickland*, 466 U.S. at 687; *Bledsoe v. State*, 283 Kan. 81, 90-91, 150 P.3d 868 (2007). A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Claims that fall into the second category involve an exception to the *Strickland* standard pronounced by the United States Supreme Court in *United States v. Cronic*, 466

8

U.S. 648, 658-59, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). *Sola-Morales*, 300 Kan. at 883. This exception applies when the movant was completely denied the assistance of counsel or was denied counsel "'at a critical stage of a proceeding.'" *Galaviz*, 296 Kan. at 181. In such instances, the movant is not required to show that the lack of counsel affected the trial's outcome, and the court may presume the movant was prejudiced. 296 Kan. at 181; see *State v. Stovall*, 298 Kan. 362, 375, 312 P.3d 1271 (2013).

A.      *Was Salazar-Moreno denied counsel of his choice?*

Salazar-Moreno cites three cases to support his argument that he was denied the counsel of his choice:  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006); *United States v. Russell*, 205 F.3d 768 (5th Cir. 2000); and *Green v. Arn*, 809 F.2d 1257 (6th Cir.), *cert. granted*; *judgment vacated and remanded on other grounds*, 484 U.S. 806 (1987). In *Gonzales-Lopez*, 548 U.S. at 150, the Supreme Court granted a new trial because the defendant was denied counsel of his choice by the district court when it disqualified the attorney hired by the defendant. The Court distinguished between a defendant's right to counsel of his or her choice and the defendant's right to effective counsel.

> "[A] violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced. [Citation omitted.]
>
> The right to select counsel of one's choice, by contrast, has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. . . . Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to

9

effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." 548 U.S. at 147-48.

In *Russell*, the district court did not continue the trial despite the fact that the defendant's counsel had fallen ill and was taken to the hospital. Although the codefendant's counsel indicated he would "sit in" for the defendant's lawyer and the State was restricted to calling witnesses only impacting the codefendant, the Fifth Circuit Court of Appeals concluded that the evidence which was introduced did implicate the defendant and the district court was obligated to inquire of the defendant and explain his or her right to counsel, ensuring that any waiver was knowing and voluntary. 205 F.3d at 769-71. The Fifth Circuit ordered a new trial, holding that the defendant was denied his right to counsel of his choice during a critical stage of the proceedings. 205 F.3d at 772.

In *Green*, counsel was attending a jury sentencing hearing in another courtroom on behalf of a different client while counsel for the two codefendants continued the cross-examination of a witness. The Sixth Circuit Court of Appeals held that the defendant was entitled to a new trial because he was denied the counsel of his choice during one afternoon of the trial—a critical stage of the proceedings. 809 F.2d at 1263-64.

All three of the cases cited can be easily distinguished from the present case as the defendants in those cases were completely denied counsel during a critical stage of the proceedings. Here, Salazar-Moreno was neither completely denied counsel nor denied the counsel of his choice during a critical stage of the proceedings. The record shows that Kerns brought in Battitori as co-counsel to represent Salazar-Moreno when Kerns was appointed by the federal court to represent another defendant. During all critical stages of the proceedings subsequent to this, Battitori represented Salazar-Moreno, and not once did Salazar-Moreno complain about Kerns not being present. See *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). Moreover, as the district

10

court noted, Kerns' failure to appear at trial was between him and Salazar-Moreno; therefore, Salazar-Moreno was not denied the counsel of his choice.

B.      *Was Salazar-Moreno prejudiced by counsel's deficient performance?*

To support his argument that he was prejudiced by counsel's deficient performance, Salazar-Moreno relies upon *Gonzalez-Lopez*, 548 U.S. at 146, where the Court held that the deprivation of the Sixth Amendment right to counsel of choice is not susceptible to harmless error analysis. But as we have already noted, the United States Supreme Court has distinguished a defendant's right to counsel of his or her choice from the defendant's right to effective counsel, holding that a violation of the latter was not complete until the defendant had been prejudiced, while a violation of the former was complete "when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." 548 U.S. at 148. Because he is claiming that Kerns was ineffective by failing to represent him at trial, Salazar-Moreno must show prejudice as required by *Strickland*. Thus, the district court correctly concluded that a presumption of prejudice did not apply. We also note that the district court's finding of Kerns' deficient performance is not before us because the State has not cross-appealed that finding. See K.S.A. 2015 Supp. 60-2103(h) (to obtain appellate review, appellee must file notice of cross-appeal); *State v. Novotny*, 297 Kan. 1174, 1181, 307 P.3d 1278 (2013) (same); *Cooke v. Gillespie*, 285 Kan. 748, 754-55, 176 P.3d 144 (2008) (same).

Salazar-Moreno also cites to *State v. McFadden*, 292 N.C. 609, 615, 234 S.E.2d 742 (1977), in support of his position that he was prejudiced by Kerns' deficient performance. In *McFadden*, the defendant hired counsel to represent him. Prior to trial, defense counsel had exclusively handled the preliminary hearings and trial preparations. When it came time for trial, defense counsel was in trial in federal court and had his junior associate appear in his place. The junior associate asked the trial court for a

continuance, admitting that he knew nothing about the case and that defense counsel was the only one prepared for trial. The trial court denied the motion for a continuance, and the jury found the defendant guilty. On appeal, the North Carolina Supreme Court found that the defendant had been denied the counsel of his choice, noting that the junior associate had met with the defendant only briefly, had been practicing law for only 18 months, had tried only one jury trial, and knew nothing about the case. 292 N.C. at 615-16.

*McFadden* is unhelpful to Salazar-Moreno because it is distinguishable on its facts and because it predates *Strickland*. The North Carolina Supreme Court held that the trial court had denied the defendant the counsel of his choice by refusing a continuance because retained counsel for the defendant assigned an inexperienced associate, who was unprepared for trial, at the last minute to try the case. The defendant indicated to the associate that he wished his retained counsel to represent him during the trial, but the trial court denied the continuance despite the associate's explanation that he was unprepared for trial. The North Carolina Supreme Court also did not apply the two-prong *Strickland* standard and did not make a specific prejudice finding, although it likely considered the prejudicial effect of the junior associate's unpreparedness.

In the case before us there is no evidence that Salazar-Moreno objected to Battitori's representation. Even though the district court found Battitori's performance deficient in certain aspects, the record also shows that he had been a practicing criminal defense lawyer for many years and had recently won a Jessica's Law jury trial. Battitori spent almost 1 1/2 years working on Salazar-Moreno's case after entering his appearance on August 25, 2009. He filed motions for continuances, as well as several pretrial and posttrial motions on Salazar-Moreno's behalf, and he was the only attorney prepared for trial. So, unlike in *McFadden*, Kerns' absence at trial did not prejudice Salazar-Moreno and did not constitute ineffective assistance of counsel.

12

## DID KERNS AND BATTITORI PROVIDE INEFFECTIVE ASSISTANCE OF COUNSEL BEFORE AND DURING TRIAL?

**A.** *Did Kerns and Battitori provide ineffective assistance of counsel prior to trial?*

Salazar-Moreno also claims that his right to effective assistance of counsel was violated by Kerns' and Battitori's failure to consult with him before trial. Specifically, Salazar-Moreno argues that the time before trial is a critical stage of the proceedings; Kerns' and Battitori's failure to consult with him during this time constructively denied him counsel during a critical stage; and, as a result, prejudice must be presumed under *Cronic*. Salazar-Moreno reprises the arguments he made before the district court.

At the evidentiary hearing before the district court, Kerns testified he had met with Salazar-Moreno at least five times, probably more, but that he did not keep any records of these meetings. Other than when he met with Salazar-Moreno about taking over the case and meeting at court appearances, Battitori recalled only one meeting between him and Salazar-Moreno. Battitori testified he could not recall how many substantive meetings about the case he had with Salazar-Moreno, but he knew it was not none. Salazar-Moreno, on the other hand, testified he met with Kerns only once for less than 10 minutes and that they did not discuss the substance of the case. He further testified that the meeting about Battitori taking over the case was 15 to 20 minutes long but that they did not discuss anything substantive. According to Salazar-Moreno, when Battitori asked to meet about a discovery issue, it had been almost a year since Salazar-Moreno had met with either attorney. Salazar-Moreno testified that the case was not discussed at that meeting, he never spoke to Battitori about the case, and his meeting with the attorneys lasted only 5 to 10 minutes with no discussion of the details of the case.

Based on that testimony, the district court initially found that Battitori had spent little time preparing for the case and that the performance of both attorneys was deficient.

13

Nevertheless, the district court concluded that Kerns' and Battitori's deficient performance did not prejudice Salazar-Moreno. After the district court issued its order, Salazar-Moreno filed a motion to alter or amend, arguing in part that the district court should have applied the *Cronic* standard. At a hearing on the motion, the district court clarified that Battitori's lack of preparation did not amount to ineffective assistance of counsel and stated that it believed it had adequately addressed all of the issues. In the journal entry issued after the hearing, the district court incorporated by reference its previous order and further found that while Salazar-Moreno "did not receive the effective assistance of honest, loyal, genuine and faithful representation at the pretrial stage by either Kerns or Battitori," Salazar-Moreno had not satisfied the prejudice prong of *Strickland*. The district court concluded the presumption of prejudice in *Cronic* did not apply.

In finding that *Strickland* rather than *Cronic* controlled, the district court implicitly found that Salazar-Moreno was not completely denied the assistance of counsel at a critical stage of the proceedings. See *Galaviz*, 296 Kan. at 181. Similarly, the district court also implicitly found that while Kerns' and Battitori's performance was deficient for failing to consult with Salazar-Moreno, it was not so deficient as to have constructively denied him the assistance of counsel.

In support of his argument that Kerns' and Battitori's failure to consult constitutes a complete denial of counsel, Salazar-Moreno relies solely on *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003). There, defense counsel was appointed and represented the defendant at the preliminary hearing and at a conference before being suspended from practicing law in the state. The day jury selection began for the defendant's trial, defense counsel was reinstated. On appeal, the Sixth Circuit found that the pretrial period was a critical stage of the proceedings to which the defendant had the right to assistance of counsel. 325 F.3d at 742-44. The court held that because not only was defense counsel suspended from practicing law in the 30 days preceding trial but also because defense

14

counsel had consulted with the defendant for a total of only 6 minutes, spread out over 3 meetings during the 7 months leading up to trial, the defendant was constructively denied counsel at a critical stage and the *Cronic* presumption of prejudice applied. 325 F.3d at 741-44, 747-48.

The actions of defense counsel in *Mitchell*, however, are distinguishable from those of Salazar-Moreno's attorneys. First, neither Kerns nor Battitori was suspended for any length of time before trial. Second, while the district court may have found that both attorneys performed deficiently by failing to adequately consult with Salazar-Moreno before trial, both attorneys did provide other services. Kerns negotiated a plea deal for Salazar-Moreno, hired a private investigator, and obtained and reviewed discovery. Battitori filed several pretrial motions on Salazar-Moreno's behalf and represented him at a pretrial motion hearing. Third, unlike the defendant in *Mitchell* who made several requests for new representation, Salazar-Moreno never asked for or sought a new attorney. Based on these facts, Salazar-Moreno was not completely denied the assistance of counsel during the pretrial stage, making *Mitchell* inapplicable. See *Anderson v. Berghuis*, No. 1:10-CV-349, 2015 WL 566619, at *11-12 (W.D. Mich. 2015) (unpublished opinion); *Horn v. Lafler*, No. 1:10-CV-680, 2014 WL 4983659, at *30-31 (W.D. Mich. 2014) (unpublished opinion).

Besides the factual distinctions between this case and those where a defendant's counsel of choice was denied, the rationale behind the *Cronic* exception does not support its application here. In *Adams*, 297 Kan. at 670-71, our Supreme Court stated:

> "Errors evaluated under *Cronic* are rare, and most alleged deficiencies are properly evaluated under *Strickland* rather than *Cronic*. See *Florida v. Nixon*, 543 U.S. 175, 189-90, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (noting that *Cronic* itself illustrates 'just how infrequently' cases will fall into its exception). To fall under the *Cronic* exception, counsel's abandonment of the defendant must be 'complete,' and

15

counsel must fail 'entirely' to subject the State's case to meaningful adversarial testing. [Citations omitted.]"

In this case, Kerns' and Battitori's failure to regularly consult with Salazar-Moreno, which in the district court's view amounted to deficient performance, was not a complete denial of or abandonment by counsel. *Cronic*'s narrow exception was meant to apply only in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. As the record shows, that was not the case here.

Therefore, even though the district court found that Kerns' and Battitori's failure to consult with Salazar-Moreno during the pretrial stage constituted deficient performance, the district court's ultimate legal conclusion that Salazar-Moreno was not constructively denied the assistance of counsel and that *Cronic*'s presumption of prejudice did not apply was correct. As a result, the district court properly applied *Strickland*'s two-prong test.

As with the previous issue, because the State did not cross-appeal the district court's finding that the performance of Kerns and Battitori was deficient, the only issue before us is whether Salazar-Moreno was prejudiced by Kerns' and Battitori's deficient performance. See K.S.A. 2015 Supp. 60-2103(h); *Novotny*, 297 Kan. at 1181; *Cooke*, 285 Kan. at 754-55. Because Salazar-Moreno's only argument regarding prejudice is that prejudice must be presumed under *Cronic*—he does not otherwise argue that he was prejudiced by Kerns' and Battitori's deficient performance—we remain unpersuaded. Kerns and Battitori did not provide Salazar-Moreno with ineffective assistance of counsel during the pretrial stage.

B.      *Did Battitori provide ineffective assistance of counsel during trial?*

Salazar-Moreno next claims that several of Battitori's alleged errors before and during trial constituted ineffective assistance of counsel. Those errors involved testimony about the phone call between Dawn and the victim's mother, Dr. Losew's testimony, the victim's testimony, and Battitori's failure to investigate. Salazar-Moreno separates these claims into four separate issues on appeal, but they are really four subissues of the main issue—whether Battitori provided ineffective assistance of trial counsel. Like before, because the State has not cross-appealed the district court's finding that Battitori's performance was deficient, the only issue before us is whether Salazar-Moreno was prejudiced by Battitori's deficient performance. See K.S.A. 2015 Supp. 60-2103(h); *Novotny*, 297 Kan. at 1181; *Cooke*, 285 Kan. at 754-55.

1.      *Phone call testimony*

Salazar-Moreno first argues that Battitori should have moved to dismiss the adultery charge, claiming that it is a legal impossibility to be convicted of both rape and adultery because lack of consent is an element of the former and consent is an element of the latter. He also contends that even though the State was attempting to use the adultery charge to breach the marital privilege, Battitori should have objected to the testimony about the phone call between Dawn and the victim's mother on the grounds of both privilege and hearsay.

As mentioned, the district court found that Battitori's failure to seek dismissal of the adultery charge constituted deficient performance. Moreover, Salazar-Moreno was clearly prejudiced by Battitori's deficient performance because simultaneous convictions of rape and adultery is a legal impossibility. Salazar-Moreno notes that in *State v. Platz*, 214 Kan. 74, 77, 519 P.2d 1097 (1974), the Kansas Supreme Court held that while adultery is a crime of consent, consent is a defense to rape and that proof of either crime

17

disproves the other. Therefore, Salazar-Moreno cannot be convicted of both rape and adultery, and he was entitled to dismissal of the adultery charge. Accordingly, we find Battitori's failure on this point rendered him ineffective, and we vacate Salazar-Moreno's conviction and sentence for adultery.

The heart of this issue, however, is the marital privilege. A misdemeanor adultery conviction is meager compared to a rape conviction. The State made it quite clear that Salazar-Moreno was only charged with adultery so it could introduce evidence of the phone call between Dawn and the victim's mother. On appeal, Salazar-Moreno argues that Battitori should have objected to the testimony at trial on the basis that the marital privilege described in K.S.A. 60-428 and K.S.A. 60-423(b) should have prevented D.M.D.'s mother, father, and aunt from testifying that Dawn called the victim's mother and told her that Salazar-Moreno had confessed to having sex with the victim. But the marital privilege only prevents a spouse—in this case Dawn—from testifying about confidential communications, not third-party witnesses. See *State v. Schwerdt*, No. 109,841, 2014 WL 4627487, at *11-12 (Kan. App. 2014) (unpublished opinion).

In *Schwerdt*, 2014 WL 4627487, at *11, a panel of this court noted that unlike other privileges, the marital privilege does not prevent the disclosure of confidential communication between spouses and "does not extend the privilege to all witnesses having knowledge of the communication." Although the *Schwerdt* panel found that the spouse did not directly release confidential communications that were obtained inadvertently and unintentionally, the panel had already held that "the marital privilege statute is not concerned with disclosure of marital communications absolutely, but only with disclosures made by one spouse or the other." 2014 WL 4627487, at *11. Here, the marital privilege is inapplicable because evidence of the phone call was introduced by the testimony of the victim, her mother, her father, and her aunt. As a result, Salazar-Moreno was not prejudiced by Battitori not objecting on the grounds of privilege.

The victim's testimony—and that of her mother, father, and aunt—dealt with Dawn's statement that Salazar-Moreno said he had sex with the victim. This testimony constituted impermissible hearsay. Hearsay is defined as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated[.]" K.S.A. 60-460. Their testimony was hearsay because it concerned the out-of-court statement made by Dawn and was offered to prove the truth of the matter asserted—that Salazar-Moreno admitted to the crime. While Dawn's statement could have come in under an exception to the hearsay rule because Dawn was unavailable to testify on the grounds she was prohibited from testifying about any confidential communications between her and Salazar-Moreno under the marital privilege, see K.S.A. 60-428, her statement was inadmissible. See K.S.A. 2007 Supp. 60-460(a).

In light of the hearsay nature of the testimony, we must examine whether this improperly admitted evidence created a reasonable probability that the jury would have reached a different verdict had Battitori objected to the hearsay testimony. See *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Bledsoe v. State*, 283 Kan. 81, 90-91, 150 P.3d 868 (2007). Although the marital privilege should have prevented Dawn from testifying about confidential communications between her and Salazar-Moreno, she testified about her phone call to D.M.D.'s mother anyway. When the State asked Dawn about her phone conversation with D.M.D.'s mother, Dawn testified she told her Salazar-Moreno denied having sex with D.M.D. On cross-examination, Battitori asked Dawn whether she agreed with the testimony of D.M.D.'s mother, father, and aunt that she told D.M.D.'s mother that Salazar-Moreno admitted to having sex with D.M.D. Dawn testified she disagreed. Battitori clarified by asking Dawn whether she had ever said anything like that, and she said no.

By testifying and denying that she told D.M.D.'s mother that Salazar-Moreno admitted to having sex with D.M.D., Dawn mitigated any prejudicial effect such hearsay testimony might have had. Her testimony turned the issue into a credibility contest as

19

none of the witnesses were objective and unbiased; they each testified in accordance with their interests. As a result, it came down to who the jury believed. Because the fact of whether Salazar-Moreno had admitted to having sex with D.M.D. was controverted before the jury, it does not create a reasonable probability that the jury would have reached a different verdict had Battitori objected. In other words, Salazar-Moreno was not prejudiced by Battitori not objecting to the hearsay testimony.

2.    *Dr. Losew's testimony*

Salazar-Moreno next argues that Battitori provided ineffective assistance of trial counsel by failing to object to Dr. Losew's testimony. As mentioned, because the district court found that Battitori's failure to object constituted deficient performance, the only issue is whether there is a reasonable probability that the jury would have reached a different verdict had Battitori objected to the doctor's testimony. See *Strickland*, 466 U.S. at 687; *Bledsoe*, 283 Kan. at 90-91.

According to Salazar-Moreno, Dr. Losew's repeated testimony—that, in her opinion, the injury to the victim's hymen was caused by sexual abuse based on what the victim had told her—constituted improper opinion evidence that the victim was sexually assaulted by Salazar-Moreno. In support of his argument, Salazar-Moreno cites *State v. Bressman*, 236 Kan. 296, 303-04, 689 P.2d 901 (1984), where the Kansas Supreme Court held that the doctor's testimony opining that the victim was raped by the defendant "was clearly improper and prejudicial to the right of the defendant to a fair trial." See also *State v. Lash*, 237 Kan. 384, 385, 699 P.2d 49 (1985) (expert's opinion "would require [the expert] to pass upon the credibility of witnesses or the weight of disputed evidence"). Salazar-Moreno argues that Battitori's failure to object to Dr. Losew's improper testimony prejudiced him because the victim's credibility was central to the case and the State used the doctor's testimony to bolster the victim's testimony.

20

When the State asked Dr. Losew if she had an opinion about the injury to D.M.D.'s hymen, the doctor replied that the victim's report was consistent with the examination findings and was suspicious for child sexual abuse. On cross-examination, the following exchange between Dr. Losew and Battitori occurred:

"Q.     The part that says exam is suspicious for child sexual abuse, are you saying—by you saying that that you meant to say that your findings are consistent with her story?

"A.     Her findings are consistent with her story.

"Q.     That's what you're saying that means.

"A.     What that means is that her history is a good history, and the exam is suspicious for child sexual abuse.

"Q.     Not that it proves anything, correct?

"A.     It does not prove anything.

"Q.     And you weren't there?

"A.     I was not there.

"Q.     When this happened?

"A.     When this happened."

By eliciting that testimony from Dr. Losew on cross-examination, Battitori likely cured any improper bolstering of the victim's testimony by the doctor's opinion. Dr. Losew clarified that her findings did not prove anything and that she was not there when the injury occurred, implying she could not say exactly what caused the injury. She did not comment on the victim's credibility but merely testified that her findings were consistent with what D.M.D. had told her. Similarly, in *State v. Humphrey*, 30 Kan. App. 2d 16, 24, 36 P.3d 844 (2001), *rev. denied* 273 Kan. 1038 (2002), a nurse testified that the victim's injuries were consistent with "'blunt force penetrating trauma'" and the history given by the victim but that she could not say exactly what caused the victim's injuries. This court, distinguishing *Bressman*, found the nurse's testimony admissible. 30 Kan. App. 2d at 24-26.

21

Further, in *State v. Clements*, 241 Kan. 77, 79-80, 734 P.2d 1096 (1987), the Kansas Supreme Court distinguished *Lash*, noting that a doctor can testify that a patient's injury is consistent with the facts reported without testifying that a particular crime was committed against the patient or commenting on the patient's credibility, which allows defense counsel to cross-examine the doctor about other causal circumstances that could be consistent with the doctor's opinion. There, the court found that although a doctor's testimony may corroborate some of a victim's testimony "inferentially," the testimony was not an impermissible opinion on whether the victim was testifying truthfully. 241 Kan. at 80. In this case, as in *Clements*, Dr. Losew's testimony may have partially corroborated the victim's testimony, but it was not evidence of the victim's credibility and allowed Battitori to clarify on cross-examination that Dr. Losew did not know how the victim's injury was caused.

Battitori's failure to object to Dr. Losew's testimony did not constitute ineffective assistance of trial counsel.

3.      *The victim's testimony*

Salazar-Moreno further argues that Battitori provided ineffective assistance of trial counsel by eliciting bad acts evidence during his cross-examination of D.M.D. Again, the only issue before us is whether there is a reasonable probability that the jury would have reached a different verdict had Battitori not elicited such evidence. See K.S.A. 2015 Supp. 60-455; *Strickland*, 466 U.S. at 687; *Bledsoe*, 283 Kan. at 90-91.

Salazar-Moreno asserts that Battitori performed deficiently in his cross-examination of D.M.D. by eliciting evidence that Salazar-Moreno was "a violent person who bought guns and physically assaulted other people." While the testimony was brief, Salazar-Moreno suggests that Battitori further erred by mentioning the testimony during his closing argument. Salazar-Moreno argues that the testimony Battitori elicited from

22

D.M.D. "'could not have accomplished anything other than to create prejudice in the minds of the jury'" by painting Salazar-Moreno as a violent person, quoting *State v. Dornbusch*, 384 N.W.2d 682, 687 (S.D. 1986).

D.M.D. testified during the State's direct examination that she was scared of Salazar-Moreno. During cross-examination, Battitori asked D.M.D. why she was afraid of Salazar-Moreno. D.M.D. replied that Salazar-Moreno had mentioned beating up someone at work. When Battitori asked her to clarify, D.M.D. said Salazar-Moreno told her he beat up a guy at work and told her parents about guns he was buying. Battitori asked D.M.D. if she thought Salazar-Moreno was going to shoot her or beat her up, and D.M.D. replied she did not know. D.M.D. also testified, the recitation of which is omitted from Salazar-Moreno's brief, that Salazar-Moreno had never been mean to her in any way and that he had never threatened her in any way.

The most prejudicial aspect of D.M.D.'s testimony was likely her statement that she was afraid of Salazar-Moreno. However, any prejudicial effect that her testimony might have had was mitigated by Battitori's follow-up questions to which D.M.D. testified that Salazar-Moreno had never been mean to her and had never threatened her. Even Battitori's reference to D.M.D.'s testimony in his closing argument mitigated any prejudicial effect because he reiterated that Salazar-Moreno had never threatened or been mean to the victim. In short, D.M.D.'s vague and brief comments about Salazar-Moreno beating someone up and buying guns likely had little effect on the outcome of this case. Battitori's elicitation of bad acts evidence during the cross-examination of the victim did not constitute ineffective assistance of trial counsel.

4.      *Battitori's failure to prepare*

Salazar-Moreno finally argues that Battitori provided ineffective assistance of trial counsel by failing to thoroughly investigate the case, interview witnesses, challenge the

23

jury array, and adequately prepare for trial. As with the other issues, because of the district court's finding that Battitori's performance was deficient, the only remaining issue is whether there is a reasonable probability that the jury would have reached a different verdict had Battitori investigated, interviewed, challenged, and prepared. See *Strickland*, 466 U.S. at 687; *Bledsoe*, 283 Kan. at 90-91.

Salazar-Moreno alleges that Battitori's performance was deficient because he did not timely challenge the venire and did not know how to select a jury representative of a fair cross-section of the community pursuant to *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). He also contends that Battitori should have interviewed Dawn before trial. According to Salazar-Moreno, he was prejudiced by Battitori's deficient performance because counsel failed to obtain and put on evidence impeaching the credibility of the victim, citing *State v. Brooks*, 297 Kan. 945, 305 P.3d 634 (2013), for support. Specifically, Battitori's failure to impeach the victim's credibility with evidence readily available from Dawn and from Salazar-Moreno's daughter denied Salazar-Moreno his fundamental right to confront the victim.

Although Salazar-Moreno mentions that Battitori failed to challenge the jury array, Salazar-Moreno does not argue how he was prejudiced by Battitori's failure to do so. The heading of the section of Salazar-Moreno's brief in which he argues prejudice reads: "The Petitioner was prejudiced by Battitori's ineffective preparation." But nowhere in that section does Salazar-Moreno raise any argument addressing how he was prejudiced by Battitori's failure to challenge the jury array. Instead, in a conclusory last sentence he simply states: "The district court's conclusion that the Petitioner did not establish prejudice following Battitori's failure to challenge the array of jurors and impeach [the victim] was erroneous." Salazar-Moreno, as the movant, has the burden of establishing prejudice. See *Bledsoe*, 283 Kan. at 90. Further, issues not briefed are deemed waived or abandoned. See *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016). As a result, the only issue is whether Salazar-Moreno was prejudiced by

24

Battitori's failure to obtain evidence that could have been used to impeach the victim's credibility.

It appears that Salazar-Moreno's argument is centered on Battitori not being aware that Salazar-Moreno's daughter went to the store with D.M.D. and Salazar-Moreno when the first sexual contact occurred. Salazar-Moreno argues that Battitori could have been aware of that information had he interviewed Dawn before trial and then could have used that information to impeach D.M.D's credibility.

According to the transcript, D.M.D. made two trips to the store with Salazar-Moreno; Salazar-Moreno's daughter came along on one of those trips. In D.M.D.'s written statement admitted into evidence, she stated that there were indeed two trips. The first trip was to Hobby Lobby, and Salazar-Moreno's daughter accompanied them. The second trip was to Dillons, and Salazar-Moreno's daughter did not come along. It was during the second trip—on the way home from Dillons—that Salazar-Moreno touched the victim inappropriately. Battitori did not need to interview Dawn to learn this information because he could have just read the transcript of the preliminary hearing. At the evidentiary hearing, Dawn testified only that her daughter was with Salazar-Moreno and D.M.D. that day. But D.M.D. explained in her statement and testimony that Salazar-Moreno's daughter did not want to go on the second trip. Because Salazar-Moreno has not shown that D.M.D.'s testimony would have been impeached had Battitori interviewed Dawn, his failure to do so likely had little effect on the outcome of the case.

Also, Salazar-Moreno's reliance on *Brooks* is misplaced. In *Brooks*, the rape victim testified during cross-examination that the defendant's penis was uncircumcised and had a scar on the side. The defendant told defense counsel that he did not have a scar on his penis, but defense counsel failed to obtain evidence to impeach the victim's credibility. On review of this court's decision, the Kansas Supreme Court found that defense counsel's failure to obtain impeachment evidence was prejudicial because the

25

victim's credibility was a critical component and the defendant was effectively denied the opportunity to adequately cross-examine the victim. 297 Kan. at 953-54. Here, while the victim's credibility was important to this case as well, the only impeachment evidence that Salazar-Moreno claims Battitori could have obtained had he interviewed Dawn was that their daughter was with the victim and Salazar-Moreno on the day the first inappropriate sexual contact occurred. Based on D.M.D.'s testimony that Salazar-Moreno's daughter was with them but did not go on the second trip to the store, the only evidence that Salazar-Moreno claims Battitori would have discovered had he interviewed Dawn would not have impeached D.M.D.'s credibility.

Battitori's failure to interview Dawn before trial did not constitute ineffective assistance of counsel.

## DID THE CUMULATIVE EFFECT OF KERNS' AND BATTITORI'S ERRORS RESULT IN PREJUDICE TO SALAZAR-MORENO?

Salazar-Moreno's last claim is that the cumulative effect of Kerns' and Battitori's deficient performance resulted in prejudice. Quoting *Mullins v. State*, 30 Kan. App. 2d 711, 718, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), Salazar-Moreno argues that the combined errors of his attorneys "'so undermined the proper functioning of the adversary process that the trial cannot be relied on as having produced a just result.'"

In *Mullins*, the defendant raised two claims of ineffective assistance of counsel. This court found that defense counsel was ineffective as to the first claim. 30 Kan. App. 2d at 718. On the second claim, while this court determined counsel was deficient, it also found that the claim, standing on its own, did not prejudice the defendant but that it added to the cumulative effect of the trial errors "due to the intertwining of the factual basis of the two claims." 30 Kan. App. 2d at 718-19.

26

This case was largely a credibility contest between D.M.D. and Salazar-Moreno. In finding that Salazar-Moreno was not prejudiced by his attorneys' errors, the district noted that D.M.D. was "composed and articulate as she described each of the incidents" of inappropriate sexual contact. The district court also determined that D.M.D.'s testimony was corroborated by the testimony of others. Dr. Losew, for instance, testified that while she could not exactly say how the injury to D.M.D.'s hymen occurred, it was consistent with sexual abuse. The most damning evidence, however, which Salazar-Moreno scarcely mentions, was the phone records. Those records showed that Salazar-Moreno and D.M.D. had called each other 145 times and had talked for over 1,600 minutes in December 2007. That much communication between a grown man and a 13-year-old girl to whom he is unrelated is strong circumstantial evidence of an inappropriate relationship, and a "'conviction of even the gravest offense'" can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016) (quoting *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 [1990]).

While a defendant can be prejudiced by the cumulative effect of trial counsel's errors, even if none of the errors individually would have affected the jury's verdict, there was no prejudice here. The weight of the evidence presented, although partly circumstantial, outweighed any prejudicial effect Kerns' and Battitori's deficient performance may have had. In the language of the controlling standard, based on the evidence presented, there is no reasonable probability that but for Kerns' and Battitori's deficient performance the jury verdict would have been different. See *Strickland*, 466 U.S. at 687; *Bledsoe*, 283 Kan. at 90-91. The cumulative effect of Kerns' and Battitori's errors did not prejudice Salazar-Moreno.

Accordingly, while we vacate Salazar-Moreno's conviction and sentence for adultery, we affirm the remainder of the district court's judgment.

Affirmed in part and vacated in part.